**WILBUR–ELLIS COMPANY, a California corporation, Plaintiff,**

v.

**The M/V CAPTAYANNIS S, her engines, tackle, apparel and furniture; and her Owner, Sarantex Shipping Company, a Panama Corporation; and A. H. Basse A/S of Copenhagen, the Time Charterer; and Norsildmel of Bergen, the Charterer, Defendants.**

**Civ. No. 67–568.**

United States District Court
D. Oregon.

Nov. 10, 1969.

---

2. Four months and 18 days.

———◆———

Kenneth E. Roberts, of Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for plaintiff.

John R. Brooke, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendant Sarantex Shipping Co.

## OPINION

BEEKS, District Judge.

Plaintiff, consignee of a cargo of fish meal, seeks to establish liability of the Greek cargo motor vessel CAPTAYANNIS "S" (Vessel) and Sarantex Shipping Company, a Panamanian corporation (Owner), for cargo damage/loss and other expenses arising out of the grounding and constructive total loss of Vessel on Clatsop Spit at the mouth of the Columbia River.[1]

Defendants A. H. Basse A/S of Copenhagen and Norsildmel of Bergen, time and voyage charterers, respectively, of Vessel, have been dismissed from this action.

■ To establish liability plaintiff contends Vessel was unseaworthy in that (1) the radio transmitters and receivers were defective, (2) the radio operator was incompetent, (3) the vessel was manned by an incompetent and inexperienced crew, and (4) did not have a sufficient complement of officers to stand watch so that the Master was caused to suffer great fatigue and anxiety, all of which were known to Owner who failed to use due diligence to make Vessel seaworthy before and at the beginning of the voyage, as required by Sec. 3, U.S. Carriage of Goods by Sea Act,[2] and all of which proximately resulted in the casualty aforesaid.

Defendant denies plaintiff's contentions and states affirmatively (1) it exercised due diligence to make Vessel seaworthy at and before the commencement of the voyage, and (2) the grounding proximately resulted from the act, neglect or fault of the Master for which it is exempted from liability by Sec. 4, U.S. Carriage of Goods by Sea Act,[3] but (3) if liability be established it is entitled to limitation thereof pursuant to 46 U.S. C.A. § 183 et seq.

Owner acquired Vessel in Rotterdam during the latter part of August, 1967, and on September 2nd she departed for Aalesund/Molustranda, Norway for the loading of cargo. On September 13 Vessel departed her last loading port for Portland, Oregon. She transited the Panama Canal on October 7th and arrived off the Columbia River lightship in the early morning of October 22nd, the day of the casualty.

The short period of ownership of Vessel is a saga of difficulty with the radio equipment, principally the inability of the

---

1. The grounding occurred approximately .6 miles from Buoy No. 10 on a bearing of approximately 140° T at 1836 on October 22, 1967.

2. 46 U.S.C. § 1303(1) (a) and (b).

3. 46 U.S.C. § 1304(2) (a).

radio operator to communicate with land stations. Commencing on September 1st, while Vessel was at Rotterdam, until shortly prior to the grounding the deck log is replete with entries evidencing abnormality in equipment and/or operation.

The Master's concern is evidenced in his correspondence to Owner.[4] Originally he tended to accept the radio operator's report that the radio was damaged or defective. Later he questioned her competency. After reviewing and considering all of the evidence carefully I am in accord with this latter view and I find she was incompetent. The radio operator was a young lady 25 years of age of Greek nationality. Following graduation from high school she attended a two year school where she received training in radio operation, followed by three years service (1963–1966) on two Greek Mediterranean cruise ships which did not operate during the 3–4 winter months. She received her radio operator's license in October 1966. For the last three months of her employment on one of the cruise ships she served as radio operator.

I find it singular that throughout the voyage she had little difficulty in communicating with other Greek vessels, but for the most part she was unable to communicate with non-Greek land stations.

Furthermore, I do not believe Owner exercised due diligence in hiring her. The record is devoid of any indication as to the type of equipment she was familiar with or that she was ever informed of the make, type and age of the equipment on Vessel and whether she knew how to operate it or whether she had ever had experience in communicating with non-Greek stations or whether she knew and had used the International Morse Code or "Q" signals for radio-telephone communication. The brief and sketchy investigation made by Owner of her qualifications prior to employment was inadequate to determine her competency on a

ship such as Vessel for a voyage such as that in contemplation.

At about 2400, October 21st, the radio operator informed the Master that she could not send telegrams to Vessel's agent in Portland relating to arrival and other matters and at that time the Master logged that he had "received cable from the Pilot station Astoria that the Pilot will try to board on arrival provided weather conditions allow it" although he had not received weather reports as to the conditions of the Columbia River entrance.

At 0430, October 22nd, Vessel sighted the Columbia River lightship and the Master states he attempted to communicate by some type of Morse blinker without answer.

At 0500, the Master noted in the deck log "presume pilot will be unable to embark. * * *"

At 0512 the Master said he again attempted to communicate with the lightship by whistle signal but received no response.

During the forenoon the Master states he was informed by the radio operator that she was attempting to contact the Pilot station in Astoria without result and at 1000 he entered in the log "The Radio Operator does not try to contact Astorie Radio Station for assistance by the Pilots, but she is in communication with other Greek vessels in the area for matters unconnected with ship's service."

From 0500 to 1535 the deck log records the wind as between Force 8–9 [5] with high seas, which between 0800 and 1200 were breaking over the decks. Force 8 is a fresh gale with winds of 34–40 knots. Force 9 is a strong gale with winds of 41–47 knots. At Force 8 waves are as high as 58′ but average 19′–28′. At Force 9 they are as high as 81′ but average 31′–40′.[6]

At 1535 the Master testified it rained very heavily and the waves seemed to subside to 10′–15′ which made it possible

---

4. See Appendix A for correspondence.

5. Beaufort's Scale.

6. Hydrographic Office Pub. 603, 1955.

to change course to a 40°T. for the purpose, so he says, of coming up on the lightship to attempt to communicate a further request for a pilot. He continued this course until 1730 at which time he was 2.5 miles from the lightship on a bearing of approximately 152°T. At this time he changed course to 045°T, the main channel course to Sand Island Range. Thereafter, the deck log records buoys 2 to 8 (main channel markers) all of which were encountered on the main channel course of 045°T. At 1822, abeam Buoy #8, the log records a course change to 080°, the proper course for the Sand Island Range, and a notation that "From Columbie L/V we encountering exceptionally high seas, after decks and boat decks covered by high seas. Requesting Pilot using ship's blast. Unable keep vessel in the center of channel and we drifting continuously towards the starboard end of the channel and vessel is almost out of control."

As should have been expected the wave height increased as the water depth decreased, Vessel was in heavy breakers and out of control and she was fast aground at 1836.

The Master states repeatedly that he continued on past the lightship and entered the channel for the purpose of locating the pilot or the pilot boat, all the while trying to raise the pilot by radio. The entries in the log book tend to support him, but there is no evidence as to when they were made. In any event I do not believe him.

The Master knew that a pilot would be available only if the weather allowed it and he recorded in his log that weather conditions were such that he presumed the pilot would be unable to embark. The radio operator testified she received a telegram from the pilot during the forenoon of October 22nd stating the weather was bad and he could not come. I am satisfied that the Master knew that a pilot would not be available under the existing conditions of wind and sea. Accordingly, I am of the opinion that the Master decided to cross the Columbia River Bar without a pilot—an exceedingly gross error in navigation and a decision of sheer lunacy.

The immediate cause of the grounding was the Master's decision to proceed across the Columbia River Bar, but was it the proximate cause? If so, this action must be dismissed. As previously indicated, I do not believe the Master proceeded down the main channel beyond the lightship to locate the pilot, nor do I believe the inability of the radio operator to communicate with the pilot/pilot station on October 22nd proximately caused his ill advised course of action.

Thus, the only area left for exploration is whether the incompetence of the radio operator or the manner in which Vessel was manned and watches determined, both of which were known to Owner before and at the beginning of the voyage, played any part in the Master's decision. In short, may it be said that the decision was that of a mind fatigued by worry and overwork? Was he capable of making a decision or did the factors mentioned in the following paragraphs, singly or together, render him incompetent to properly judge? If so, his decision would not be the proximate cause of the casualty.

The manning of Vessel was reminiscent of the days of the Brig PILGRIM and the Bark CUTTY SARK when profits were the owners' paramount consideration and human values were of little significance. Vessel's complement consisted of the Master and twenty crewmen, the deck officers consisting only of a Chief and Second Mate. The deck crew were divided into two watches, the superannuated "watch and watch" system in which the officers and crew stood watch twelve hours a day in two watches of six hours each, a method which in itself is an invitation to disaster.[7] The

---

7. This system is unlawful under American law. The Denali, 105 F.2d 413 (9th Cir. 1939), aff'd on re-hearing, 112 F.2d 952 (1940) cert. denied, 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444 (1940) and 46 U.S.C. § 673 (enacted subsequent to the occurrence which resulted in *The Denali* litigation).

Chief Mate and two seamen had the 6–12 watch and the Second Mate and two seamen the 12–6 watch. The Master agreed to stand a watch[8] and because the Second Mate was inexperienced the Master stood his watch for him.[9]

By American standards Vessel was undermanned, but there is no statutory violation involved as in *Denali*,[10] and, except as hereinafter stated, the undermanning establishes only the parsimony of Owner.

From the evidence it would appear that the incompetence of the radio operator and inability to receive weather reports caused the Master to be extremely weary and exhausted, particularly while traversing the Caribbean, as is evidenced by the aforementioned letters from the Master to Owner.[11]

More than 50 years ago Judge Hough recognized the same problem in Union-Dalzelline, 1932 A.M.C. 1331, 1336 (1914) when he said:

> "It is matter of common knowledge that safety in anything which requires human effort depends, in the last analysis, on the human being. A weary man is infinitely more dangerous than a defective pipe or an obscured light, because he is unfit to discover the unfitness of the inanimate object."[12]

There is other evidence, however, which must be considered in determining the reason for the Master's ill-fated decision of October 22.

As Vessel approached the Azores the Master notified Owner that the radio was in bad condition and that he should approach a port and repair it. Owner refused permission because each delay was very important because it was against the charter party which I interpret to mean that delay would subject Owner to a claim for damages.[13] On October 4th the voyage had been delayed two days and the Master was concerned because he could not "gain better speed than 12–12.5 K during good weather.[14] On October 14th he wrote Owner that he expected to reach Portland by October 21st.

Thus, on the morning of October 22nd we have a vessel off the Columbia River Bar considerably delayed on her voyage from Norway because of weather and inability to conform to her warranty of speed, commanded by a young man, his first command, anxious to make a name for himself and desirous of reaching Portland that day, a day later than he had forecast one week previously, and fearful of incurring the wrath of a penurious owner.

I suspect that the long hours of work, the fatigue and anxiety may have affected the Master's judgment, but I am unable to find this as a fact from the evidence before me. The letter of 10/14/67[15] does not mention exhaustion, and there is nothing in the evidence subsequent to 10/6/67 so indicating. Accordingly, I find the proximate cause of the casualty to be the Master's negligent decision to proceed across the Columbia River Bar.

If the carriage here involved was subject to the Harter Act[16] I would deny defendant exoneration and enter judgment for plaintiff.[17]

8. Ex. 49, page 11.

9. Ex. 9, a letter from the Master to the Owner, wherein it is said "Michaletos (Second Mate) lacks bridge experience, but I will take his place there."

10. See note 7, *supra*.

11. See Appendix A.

12. Quoted with approval in *The Denali*, Note 7, *supra*.

13. Owner's time charter provided that the Master shall prosecute his voyage with the utmost dispatch.

14. In the time charter Owner warranted 13 knots in good weather.

15. See Appendix A.

16. 46 U.S.C. § 192.

17. Exoneration from liability for faults or errors in navigation under Section 3 of the Harter Act, is conditioned upon the use of due diligence to make the vessel in all respects seaworthy and properly manned whether or not there is any causal relation between the unseaworthiness and the loss. May v. Hamburg-etc., Aktiengesellschoft [*The Isis*,] 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348.

Likewise, if a statutory violation was involved in the manning of Vessel or in the watch system employed by Owner, I would enter judgment for plaintiff because there are

> " * * * compelling reasons why the violation of a statute to prevent loss of life and property by attempting to secure absence of fatigue from the vessel's navigators shall have the Pennsylvania rule apply in suits against the owner * * *." [18]

and once the violation is found it is presumed the the fault is causal and the violator has the burden of showing it was not.[19] This burden is extremely difficult, if not impossible, for the violator to discharge[20] and if Owner had such burden here I would find that he had not discharged it.

■ The right of shipowner to exoneration from liability under Section 4(2) (a) of the Carriage of Goods by Sea Act[21] is, unlike the Harter Act, not conditioned on a showing that due diligence was used in making the vessel seaworthy and properly manned before and at the beginning of the voyage.

Therefore, the action is dismissed with costs in favor of defendant. A conforming judgment reflecting my findings and conclusions, shall be drafted, served and presented by counsel for defendant.

### APPENDIX A

10/4/67 (two days prior to arrival in Cristobal)

> "Up until the Azores we had stormy seas, 5–6 foot waves, except for a tropical storm north of the Azores which moved eastward and which, fortunately, I skirted for a few hours. I came into a big storm with mountainous waves, 50–60 feet high, and winds of velocity 10 (......). We proceeded finally, but we were delayed two days. We were fortunate to escape calamity, and I owe this to my knowledge of

this area, because as you know, we had no wireless and could not receive weather reports. I shall write to you about this later.

> "Our Voyage continued with the usual weather of this season, until 27/9, when a passing ship informed us that we were heading into a cyclone. We still had no wireless, and could not receive bulletins. We finally were able to hear that in front of us was cyclone Edith, and next to us was a tropical storm which would become a cyclone. Fear and anxiety were my companions, but I was able to complete the whole trip with God's help."

* * * * * *

> "Unfortunately, the ship lacks a wireless, and this is true. Almost throughout all our voyage we tried to find a passing ship so we could send the necessary telegrams and reports about the weather, and that was not always possible. It is dangerous for a ship to be without a wireless. It's like the blind man who knows not where to go. At Alesund we made repairs, but a few hours after sailing we were without wireless again. We tried to repair it, and succeeded partially, working on the inner tubes, but with small results. The wireless operato_ does not have the required knowledge, and you can understand what can happen on a ship where there is no communication. When we arrive in Panama I will call experts.

> "From the above events you must realize my exhaustion and my anguish. I am in the chart room on the bridge, and I seldom leave here to go down to my room. I must follow and direct everything continually, all the movements of the ship. I glorify God to this day because things are better than I have anticipated, and I don't complain about being tired."

10/6/67 (at Cristobal)

---

18. *The Denali*, 9 Cir., 112 F.2d 952, 957 (1940).

19. See Note 18, *supra* at 959.

20. See Note 18, *supra* at 957.

21. 46 U.S.C. § 1304(2) (a).

"My biggest problem that made me weary was the matter of the wireless operator. You must bear in mind that sailing away from Alesund we were without wireless on the ship. I was left without communication without weather reports and without any contact. The wireless operator maintained that the wireless was cheap of quality but I think the opposite. The whole voyage I spend on the bridge in the chart room so I can follow her and to urge her to keep trying. The only ones she was able to communicate with were the Greek ships. Thus we were able to send those indispensable telegrams. Sailing at this very dangerous time of the year, and in this territory where there are typhoons and without weather reports and only my experience to depend on. * * *

"She makes me so nervous that one of these days I will throw her overboard."

10/14/67 (at sea, enroute to Portland, Ore.)

"It has been a week since we left the Panama Canal and already we are in the Gulf of California sailing at full speed toward Portland which, with God's help, we hope to reach October 21, thus ending this long trip from Norway. Since the weather was good today, I took the opportunity to leave the bridge and write to you a few words. * * *"

"The wireless is a big problem, and the wireless operator has created many problems for me. The only thing the wireless operator does is to call Greek ships and send telegrams, and while she cannot communicate with near-by stations, she is able to communicate with ships twice the distance away." * * *

"To continue about the wireless operator, I understand she lies to me in order to cover her inexperience, in spite of the fact that I have always been good to her, and this is one reason that to this day I don't understand what is going on in the wireless.

These days we pass many ships, the *Plothy* and the *Laimau*. We have continuous communication and they all hear us very well on the telephone, in briefs and in between. But when the time comes for a bulletin or when I tell her to listen for a telegram, she answers that the wireless is out of order. Of course I'm not surprised, because she is a woman and does have a weapon in her lies. I repeat, this has been a voyage without bulletins in a dangerous territory, in a small ship without communications, weather reports, and without directions. Let us hope that all will go well and we will not blunder and have other problems."