NAVIEROS OCEANIKOS, S. A., owner of the LIBERIAN VESSEL TRADE DARING, Plaintiff,

v.

S. T. MOBIL TRADER, her engines, boilers, etc., Mobil Oil Corporation, the owner of the MOBIL TRADER, and Mobil Sales & Supply Corporation, Defendants and Third-Party Plaintiffs,

v.

TRADE & TRANSPORT, INC., Third-Party Defendant.

No. 72 Civ. 1225 (HFW).

United States District Court, S. D. New York.

Feb. 27, 1976.

---

Poles, Tublin, Patestides & Stratakis, New York City, for plaintiff and third-party defendant; Theodore P. Daly and Francis R. Matera, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants and third-party plaintiffs; Donald M. Waesche, Jr., and Louis G. Juliano, New York City, of counsel.

## OPINION

WERKER, District Judge.

In the early morning hours of March 18, 1971 a fire broke out on board the Liberian tanker M/V Trade Daring. The damage which ensued resulted in the vessel being termed a "constructive total loss." This action was brought to determine responsibility for the fire and resultant damage.

The plaintiff Navieros Oceanikos (Oceanikos) is a corporation incorporated in the Republic of Panama and was the owner of the Liberian flag vessel Trade Daring (Daring).

Defendant Mobil Oil Corporation (Mobil) is incorporated in the State of New York and was the owner of the S. T. Mobil Trader (Trader).

Defendant Mobil Sales and Supply Corporation (Sales) is a corporation incorporated in the State of Delaware and on January 1, 1971 had entered into a marine fuel oil sales contract with Trade & Transport, Inc. (Transport) to furnish fuel and diesel oil to vessels specified by Transport.

The third-party defendant Transport is a corporation incorporated in the State of New York and was the agent employed by Oceanikos on behalf of the Daring to arrange for the bunkering of the vessel during all relevant times.

The Daring was built in 1955 as a combination oil and ore carrier according to the construction standards of the American Bureau of Shipping and Germanischer Lloyd, the classification societies which establish and administer those standards. Oceanikos discontinued classing the vessel with Germanischer Lloyd when it purchased the vessel. At the time of the fire it was classed solely with the American Bureau of Shipping. The Trader is a self-propelled steel tank barge built in 1967 and was employed by Mobil for general bunkering service. It has four cargo tanks subdivided into eight compartments.

At the time of the fire on March 18, 1971 the design, construction and condition of the fuel oil tanks, including deep tanks, service and settling tanks, the overflow tanks and the venting, overflow and save all systems of the Daring were in full compliance with the classification requirements of the American Bureau of Shipping. She was fully in class. Furthermore the design, construction and condition of the Daring's vent full transfer and save all systems were in conformity with good engineering design and practice and with the laws or regulations pertaining to this vessel.

The vessel because it was constructed in 1955 was not subject to the Safety of Life at Sea Convention (1960) (Solas—1960) but the fire fighting and safety

equipment of the Daring was in full compliance with the convention.

The engineering personnel aboard the Daring were not licensed under the laws of Liberia as they were required to be.

On March 16, 1971 the Daring arrived at the port of New York with a cargo of fuel oil to be discharged at the Hess Oil Terminal, Perth Amboy, New Jersey and completed discharge of the cargo March 17, 1971. On or about the same day Mobil was requested by Sales to deliver diesel fuel oil to the Daring and it dispatched Trader to effect the delivery. On March 17, 1971 at 1300 hours Trader was sent to Port Mobil where she loaded 25/26 tons in port tank # 1 and a total of 349 tons in starboard and port # 3 tanks for an aggregate amount of 375 tons of diesel fuel.

Bunkering of the Daring was scheduled for 1930 hours on March 17, 1971 at the Hess Oil Terminal, Perth Amboy, New Jersey. The Trader left Port Mobil at 1900 hours and made fast to the Daring starboard side to starboard side at 1920 hours. Bunkering was delayed because the Daring had not completed discharge of her cargo. Regulations at the terminal prohibited bunkering during discharge operations.

The fuel oil hoses were taken aboard the Daring and connected at 2220 hours on March 17, 1971.

The pumps of the Trader could pump a maximum of 200 tons per hour at the maximum rate of 1500 rpm's or 3⅓ tons per minute.

Tranquillo Milano (Milano), the pumpman on the Trader, commenced pumping bunkers at 2250 hours. He commenced pumping bunkers from No. 1 port tank slowly to insure that the lines were secure and that there was no back pressure.

The pumping speed was increased to 1500 rpm's and bunkering from No. 1 port was completed no earlier than 2310 hours. The engine was slowed to 1000 rpm's to strip No. 1 port. It takes 2–3 minutes to strip a tank. After stripping No. 1 port Milano went aft, closed the two crossover valves and commenced pumping from No. 3 port and No. 3 starboard tanks at the rate of 200 tons per hour. The time was no earlier than 2310 hours.

In his direct testimony Milano claimed that he completed bunkering at 0042 hours. This is chronologically impossible if he commenced bunkering from port and starboard # 3 at no earlier than 2310 hours. It would have taken 1 hour and 45 minutes to pump out the 340 tons of fuel in those tanks at 200 tons an hour and, at the least, 4 minutes to strip the tanks. This would put the time of completion at 0059. The statement by Milano given to Mobil's marine counsel shortly after the fire was to the effect that starboard No. 3 was stripped at 0045 hours. The statement recites "at 0045 Milano began stripping tanks first the starboard and then the port, and started blowing the line." Assuming stripping took 2 minutes for each tank this would place completion at 0049. If it took 3 minutes for each tank the time would be 0051. Taking either set of figures based upon chronology or upon the testimony of Milano I find that the bunkering was probably not completed until sometime between 0051 and 0059 hours.

At 0042 hours on March 18, 1971 the third engineer of the Daring ordered the pumpman of the Trader to stop pumping bunkers into the Daring, but the pumpman failed to comply with the order.

At 0050 hours on March 18, 1971 the master and third engineer of the Daring again attempted to order the Trader to stop pumping bunkers into the Daring, but the Trader had no one in the proper station to immediately receive or execute such an order. After a brief time the pumpman appeared on deck of the Trader and apparently carried out the order. The time of the commencement and completion of bunkering of the Daring as indicated on the delivery receipt by Captain Banks had been altered.

On March 18, 1971 Captain Cesare Del Greco, master of the tug, Grace McAllis-

ter, was assigned to undock the Daring at 0100 hours. He departed the Grace McAllister at approximately 0045 hours and went on to the dock at the Hess terminal. After a brief conversation with some Hess personnel on the dock he ascended a pilot ladder hanging from the port side of the Daring and proceeded to the starboard side to see if the bunkering barge was still alongside. He looked over the side and saw no one on the deck of the Trader. He saw and heard at least one engine running at high speed. He also saw the hose connected between the Daring and the Trader swinging around violently fore and aft and up and down in the saddle. He then turned around, walked 15–20 feet from the starboard side when he observed "two big balls of fire" coming out of the skylights near the stack on the stern of the Daring. No more than 30 seconds had elapsed from the time he boarded the Daring until he saw the balls of fire.

The fire broke out on the Daring at about 0052 hours on March 18, 1971 when bunkers overflowed from the bunkering tank system of the Daring into the engine room and were ignited. Just before the fire, oil was observed overflowing from a catch basin of the gas oil tank onto No. 3 electrical generator in the lower level of the engine room by Second Engineer Spetsiotis. He ordered Third Engineer Bafaloukos to cover the generator with a raincoat or tarpaulin and attempted to de-energize the generator to cool it as a source of ignition. At that point the fire broke out around the generator. Bafaloukos and Spetsiotis proceeded to close the vents, skylights and portholes of the engine room and at that moment there was a blackout. The crew took steps to fight the fire with hand extinguishers but due to the magnitude of the fire and the danger of the explosion their efforts were useless and they were forced to abandon the engine room. The foam system which was adequately supplied could not be brought into operation because the emergency diesel generator which activates the pumps was inaccessible due to the rapid spread of the fire. There is no question that the fire was of a flash nature which spread with great acceleration. All of the actions taken by the crew were proper considering the circumstances and nature of the fire. The regulations of the United States Coast Guard did not require a carbon dioxide system for the engine room.

During the course of the bunkering operation it was the duty of Third Engineer Bafaloukos to observe the level of the fuel through the cover of the side tanks being filled. It was his testimony that he gave the signal to stop bunkering when the fuel reached the second rung of the ladder which was installed in the manhole. This rung was below the overflow pipe of the side tank. I accept his testimony and find that he did give the signal at 0042 hours before the fuel had reached the overflow pipe. However after he gave the signal and without waiting to see if the order to stop bunkering had been executed or indeed acknowledged he left his post at the bunkering manifold to perform other duties in connection with the departure of the vessel. The order was not executed by the pumpman on the Trader. Bafaloukos was absent from this post about 8 minutes. Upon his return and after he became aware of the overflow he and the master attempted to get the bunkering stopped at 0050 hours. At the pumping rate of $3\frac{1}{3}$ tons a minute approximately $26\frac{2}{3}$ tons of fuel would have been pumped during that 8 minutes. This was more than enough to fill the vessel's overflow tanks which had a capacity of only 23.2 tons of fuel and to leave an excess of 3.4 tons. It is significant that the vessel reported only having 165 tons of bunkers at the time it ended its voyage while in fact it had some 200 tons. Thereafter the master using 540 tons as the total capacity of the vessel's fuel tanks ordered 375 tons. Trade and Transport ordered 375 tons. Accordingly the delivery of 373.8 tons loaded and delivered by Trader meant that an excess of 2.8 tons had to find egress somewhere. The excess found egress through

the save oil pipelines into the save oil basins and thus flowed into the engine room. There has been much testimony as to whether the vent lines were altered. I find that they were not. There has also been some testimony that no valves were observed on the save oil pipe lines. I do not find that convincing. The plaintiff's expert testified that there were such valves and his testimony is accepted. It is fairly obvious that such valves were not closed; otherwise the spill could not have occurred. This was the lowest point at which the fuel under head could escape. If those valves had been closed the fuel would have escaped through the vent lines which opened to the decks of the vessel. I do not accept the theory that the spill occurred from the gas oil side tanks. It appears to me that if Bafaloukos had left the gas oil valve open the spill would have occurred at a much earlier point in time.

In the light of Milano's first statement given to Mobil's marine counsel as to the time when he completed bunkering I do not find Captain Bank's statement that Milano called to him that there was a clean delivery at about 0042 hours persuasive. Certainly this may have been done within the time from 0045 to 0052–59 but I cannot find with any certainty given the exigent circumstances that the witnesses on either side of this controversy could state with certainty the exact times when they did certain things. Captain Banks was aboard the Daring when the fire broke out. He claims it started at about 0052. He never delivered the receipt which as I have already indicated was altered by erasure and not satisfactorily explained. Given the circumstances in this case it is perhaps excusable human nature to attempt to protect one's own interests. I find that both sides' witnesses have attempted to do so.

I also find that the lighting on the Trader was such as to make personnel on the deck visible and that Milano left his post to communicate to Captain Banks at some point between 0045 and 0050.

It is clear that the third engineer on board the Daring had the ultimate control of this bunkering operation. He had the obligation to communicate with the pumpman as to when the bunkering should be completed. He also had the duty to make sure that his order was carried out. The Daring was equipped with valves at the bunkering manifold and in the engine room which would have permitted the third engineer to shut off the bunkering. These were not used even after the overflow was evident. No satisfactory explanation was given for this excepting the reliance of the third engineer upon his visible observation through the manhole cover on a poorly lighted deck rather than his or someone else's observation of the amount of bunkers through the sight glasses through which he ultimately observed the overflow.

The ullages which were observed in the side tanks weeks after the casualty were such that they were below the overflow pipes in the side tanks. These were satisfactorily explained by plaintiff's naval architect whose opinion as to shrinkage due to the fire is accepted. In addition the port side tank leaked as a result of damage.

The third-party complaint is based upon a provision of the marine fuel oil sales contract entered into between Sales and Transport on January 1, 1971 which provided inter alia that Transport:

"warrants that each vessel will be properly equipped, maintained, and operated so as to avoid leakage, spillage, overflow or water or land pollution and shall hold Seller and its supplier harmless and indemnify Seller and its supplier against any claim, action, suit, assessment, fine, levy, penalty or exaction of a like nature instituted by any person (including public authorities) resulting from any such alleged leakage, spillage, overflow, or water or land pollution asserted or assessed against Seller or its supplier on the ground of damages alleged to have resulted from any such alleged leakage, spillage, overflow, or water or land

pollution, except insofar as it shall be established that such damage resulted exclusively from negligence of Seller or its supplier."

Oceanikos was the disclosed principal of Transport for purposes of this contract.

## CONCLUSIONS OF LAW

1. Jurisdiction exists in this court under U. S. Constitution, art. 3 § 2, 28 U.S.C. § 1333, 46 U.S.C. § 740 and the general maritime law of the United States.

2. The fire and ensuing damage to the M/V Trade Daring was caused in part by the fault of the plaintiff Navieros Oceanikos, S. A. by reason of the following:

(a) It failed to close the safe oil pipe line system during bunkering which would have vented vapors and overflow of diesel fuel oil onto the open deck through the normal vent system rather than into the engine room.

(b) It failed to man its vessel in accordance with the manning requirements for a vessel of the type of M/V Trade Daring promulgated by the Republic of Liberia.[1]

(c) It failed to train the unlicensed engineering personnel with respect to a standard operating procedure in the event of an overflow with respect to this particular vessel as evidenced by the failure of the third and second engineer to close the main intake valve on deck or in the engine room in sufficient time to prevent the overflow.[2]

(d) It failed to order the amount of bunkers actually required by the vessel, thus creating the false expectation that the amount of bunkers ordered could be pumped aboard the vessel without casualty.

3. The Trader was in part at fault in that its pumpman did not execute the order given by third engineer Bafaloukos to discontinue bunkering and continued to pump after the order was given, in breach of the duty to perform the bunkering service in a diligent and workmanlike manner.[3]

4. Although conclusion 3 above demonstrates a breach of the duty to perform the bunkering service in a diligent and workmanlike manner, the combined negligence on the part of plaintiff in 2(c) and (d) above are such that the responsibility for the damages may not be placed solely on defendants.[4]

---

1. The applicable regulation reads in pertinent part:

   "CHAPTER X. MERCHANT SEAMEN
   10.292 Manning Requirements.

   \* \* \* \* \*

   (2) Required Minimum Number of Engineers.

   \* \* \* \* \* \*

   (c) Every Liberian vessel propelled by machinery of 1200 horsepower or greater shall have on board and in her service, in addition to her chief engineer, at least three assistant engineers, licensed in appropriate grades, who shall stand in three watches while such vessel is in navigation."
   The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874); The Denali, 105 F.2d 413 (9th Cir. 1939); Wilbur-Ellis Co. v. The M/V Captayannis S, 306 F.Supp. 866 (D.Or.1969), aff'd, 451 F.2d 973 (9th Cir. 1971), cert. denied, 405 U.S. 923, 92 S.Ct. 962, 30 L.Ed.2d 794 (1972).

2. The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874); The Denali, 105 F.2d 413 (9th Cir. 1939); Wilbur-Ellis Co. v. The M/V Captayannis S, 306 F.Supp. 866 (D.Or.1969), aff'd, 451 F.2d 973 (9th Cir. 1971), cert. denied, 405 U.S. 923, 92 S.Ct. 962, 30 L.Ed.2d 794 (1972).

3. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 133, 76 S.Ct. 232, 237, 100 L.Ed. 133, 141 (1956); Fairmont Shipping Corp. v. Chevron International Oil Co., Inc., 371 F.Supp. 1191 (S.D.N.Y.1974), aff'd, 511 F.2d 1252 (2d Cir. 1975).

4. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Houston-New Orleans, Inc. v. Page Engineering Co., 353 F.Supp. 890 (E.D.La.1972).

5. The warranty contained in the contract between Sales and Transport appears in the absence of any evidence to the contrary to be directed at protection against environmental claims, not damage to the vessel itself.[5]

■ 6. Contracts of indemnity are to be strictly construed if there is an ambiguity.[6]

■ 7. I have concluded that there is an ambiguity since this contract nowhere mentions damage to the vessel itself as a result of the events mentioned but appears rather to contemplate claims by those other than the ship to be supplied.

8. Sales is not entitled to be indemnified by Transport or Oceanikos.

9. The third-party complaint is dismissed.

10. Mobil is not entitled to limitation of liability.[7]

11. The relative liability of the parties is fixed at 75% Oceanikos, 25% Mobil, Trader, and Sales.

The above shall constitute the findings of fact and conclusions of law as required under Rule 52, Fed.R.Civ.P.

The parties are directed to confer with respect to the damages and to define and submit to the court within 60 days from the date hereof a pretrial order setting forth those items of damage which are disputed and to follow with respect to the evidence to be presented as to each disputed item the same procedure as was followed with respect to the issue of liability.

---

5. *Assets Realization Co. v. Roth,* 226 N.Y. 370, 123 N.E. 743 (1919).

6. *Luddington v. Pulver,* 6 Wend. 404 (1831); *Fugate v. Greenberg: Publisher,* 16 Misc.2d 942, 189 N.Y.S.2d 948 (Sup.Ct.1959); *Ratigan v. New York Central Ry. Co.,* 181 F.Supp. 228 (N.D.N.Y.1960), aff'd, 291 F.2d 548 (2d Cir.

1961), *cert. denied,* 368 U.S. 891, 82 S.Ct. 144, 7 L.Ed.2d 89.

7. *Cullen Fuel Co. v. Hedger Co.,* 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189 (1933); *The Spare Time II,* 28 F.Supp. 519 (E.D.N.Y.1938); Gilmore and Black, *The Law of Admiralty* § 10–26 (2d ed. 1975).