NAVIEROS OCEANIKOS, S.A., owner of the LIBERIAN VESSEL TRADE DARING, Plaintiff-Appellant-Appellee,

v.

S.T. MOBIL TRADER, her engines, boilers, etc., Mobil Oil Corporation, the owner of the MOBIL TRADER, and Mobil Sales & Supply Corporation, Defendants and Third-Party Plaintiffs-Appellees-Appellants,

v.

TRADE & TRANSPORT, INC., Third-Party Defendant-Appellee.

Nos. 439, 965, Dockets 76–7284, 76–7297.

United States Court of Appeals, Second Circuit.

Argued Feb. 24, 1977.

Decided April 20, 1977.

Theodore P. Daly, New York City (Poles, Tublin, Patestides & Stratakis, Alan Van Praag, New York City, of counsel), for plaintiff-appellant and third-party defendant-appellee.

Donald M. Waesche, Jr., New York City (Bigham Englar Jones & Houston, Louis G. Juliano, New York City, of counsel), for defendants and third party plaintiffs-appellees-appellants.

Before MANSFIELD and VAN GRAAF-EILAND, Circuit Judges, and MISHLER, District Judge.*

MISHLER, District Judge:

On March 18, 1971, shortly after midnight, a fire broke out in the engine room of the Liberian tankship M/V Trade Daring ("Daring"). The ship was a constructive loss, and the present litigation ensued.

The action was brought by the owner of the Daring against the Mobil Oil Corporation ("Mobil"), the owner of the S.T. Mobil Trader ("Trader"), a self-propelled tank barge that had been contracted by the plaintiff to refuel, or "bunker," the Daring, and which had been engaged in this task when the fire started. The Mobil Sales & Supply Corporation ("Mobil Sales"), the seller of the fuel oil, was also named as a defendant. Both defendants brought a third-party action against Trade & Transport, Inc. ("Transport"), a company employed by the plaintiff to arrange for bunkering of the Daring. The third-party action is based on an indemnification provision of the marine fuel oil sales contract between Transport and the first-party defendants, Mobil and Mobil Sales.[1]

The District Court for the Southern District of New York (Werker, *D. J.*), after a non-jury trial, fixed the relative liability of the parties at 75% plaintiff, 25% defendants, and dismissed the third-party complaint. 409 F.Supp. 884 (S.D.N.Y.1976). Both plaintiff and first-party defendants appeal the decision of the district court. We affirm.

On March 16, 1971, the Daring arrived at the Hess Oil Terminal in Perth Amboy, New Jersey. The following day, March 17, the Trader, after loading 375 tons of oil ordered by the plaintiff through Transport, rendezvoused with the Daring at 1920 hours (7:20 P.M.), and made fast to the tankship, starboard side to starboard side. The district court found that the following events took place.

At 2220 hours the Trader's fuel oil hoses were connected to the Daring. Thirty minutes later, at 2250 hours, the Trader's pumpman, Tranquillo Milano, began pumping bunkers from the Trader's No. 1 port tank. He pumped slowly at first, to ensure that the lines were secure, and then increased the speed to the maximum of 200

---

* Of the Eastern District of New York, sitting by designation.

1. Since both parties appeal the district court's decision, for convenience we will refer to Nav-

ieros Oceanikos as the "plaintiff," and to Mobil and Mobil Sales as the "defendants" or "first-party defendants."

tons per hour, or 3⅓ tons per minute. At 2310 hours, the bunkering from the No. 1 port was completed and, "no earlier than 2310 hours," Milano began pumping from the aft and starboard tanks. The district court found that "bunkering was probably not completed until sometime between 0051 and 0059 hours [March 18]."

At 0042 hours, the Third Engineer of the Daring signaled Milano to cease pumping. Without waiting to see if his order had been acknowledged or executed, the engineer left his post at the bunkering manifold to perform other duties. The Trader continued to pump fuel oil into the Daring. At 0050 hours, the Third Engineer returned to the engine room and, realizing that the pumping had not ceased and that excess fuel oil was coming aboard, notified the Second Engineer of the problem and again ordered the Trader to stop pumping. After a brief time, the Trader's pumpman carried out the order.

At 0052 hours, the Second and Third Engineers observed oil overflowing from a catch basin of the gas oil tank onto the No. 3 electrical generator. The excess fuel oil had filled the vessel's overflow tanks and forced its way through the save oil pipelines and into the save oil basins in the engine room.[2] Moments later, the generator ignited the oil and, although the Daring's crew made reasonable efforts to put out the fire, the vessel was severely damaged.

The district court found that the overflow and resulting fire was caused in part by (1) the failure of the plaintiff to close the save oil pipeline system during bunkering, which would have diverted the excess oil onto the open deck through the normal vent system rather than into the engine room; (2) the failure to man the Daring with personnel meeting training requirements for a vessel of this type; (3) the plaintiff's failure to train the unlicensed engineering personnel to deal with an overflow, "as evidenced by the failure of the third and second Engineers to close the main intake valve on deck or in the engine room in sufficient time to prevent the overflow"; and (4) the failure to order the amount of bunkers actually required, "thus creating the false expectation that the amount of bunkers ordered could be pumped aboard the vessel without casualty." 409 F.Supp. at 889.

The Trader was found to be at fault because its pumpman had failed to execute the first order to discontinue bunkering, thereby violating its duty to perform the bunkering service in a diligent and workmanlike manner. Accordingly, the relative liability of the parties was fixed at 75% plaintiff and 25% defendants. The third-party complaint was dismissed on the ground that the indemnification provision of the marine fuel oil sales contract did not contemplate damage to bunkering vessels.

Both parties raise numerous challenges to the factual findings made by the district court. The often-elaborate factual arguments advanced by the parties misconceive the appellate function of this court. We do not sit to make de novo findings of fact, as both sides apparently would have us do. After reviewing the record in this case, we are satisfied that the findings of fact below are supported by the evidence and are not, therefore, "clearly erroneous." *See McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).

Two legal issues warrant discussion: (1) the plaintiff argues that, as a matter of law, contributory negligence on its part should not reduce its recovery for the defendants' breach of their "warranty of workmanlike service"; and (2) the defendants contend that the district court erred in its interpretation of the sales contract between Mobil Sales and Transport. We turn to an examination of these issues.

---

**2.** The save oil system consisted of collecting basins or troughs that, in normal operation, collected drippings and returns from the fuel tanks, which were then conveyed by pipeline to the overflow tanks. Unfortunately for the crew and owner of the Daring, the system also worked in reverse.

*Warranty of Workmanlike Performance*

█ Navieros contends that Mobil and Mobil Sales, in contracting to bunker the Daring, implicitly warranted that the fueling operations would be performed in a reasonably workmanlike manner. Relying on *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the plaintiff argues that its right to recover for breach of this implied warranty should not be defeated or diminished by its contributory negligence. In *Ryan*, a longshoreman, injured by cargo improperly stored by the stevedoring company, sued the owner of the ship on which the accident occurred. The longshoreman, who had not acted negligently, recovered .damages from the shipowner. The shipowner sought indemnity from the stevedoring company on the theory that the stevedore had agreed implicitly to perform its stevedoring services in a workmanlike manner. The Supreme Court upheld the shipowner's claim, recognizing the existence of such a warranty, and ruling that this warranty required the stevedore to indemnify the shipowner for any liability incurred as a result of an unworkmanlike performance. The shipowner's failure to discover and correct the stevedore's breach of warranty, moreover, did not reduce or diminish the indemnity. *Id.* at 134–35, 76 S.Ct. at 238.

The *Ryan* doctrine was developed in response to the harsh rule that a shipowner has a nondelegable duty to provide a seaworthy ship and that concomitantly its liability to an injured party for unseaworthiness does not depend on a finding of fault. *Fernandez v. Chios Shipping Co., Ltd.*, 542 F.2d 145, 150 (2d Cir. 1976); *Flunker v. United States*, 528 F.2d 239, 242–43 (9th Cir. 1975); *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1256–57 (2d Cir.), *cert. denied*, 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975); *Schwartz v. Compagnie Generale Transatlantique*, 405 F.2d 270, 275–76 (2d Cir. 1968); *DeGioia v. United States Lines Co.*, 304 F.2d 421, 425 (2d Cir. 1962). See *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Halcyon Lines v. Haenn Ship*

*Ceiling & Refitting Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952). The absolute duty of seaworthiness owed by the shipowner requires the stevedore, who is entrusted with loading operations, to indemnify the owner for liability caused by the stevedore's "failure to perform with reasonable safety." *Davis v. Chas. Kurz & Co.*, 483 F.2d 184, 187 (9th Cir. 1973), *quoted in Fairmont Shipping Corp., supra* at 1257. Thus, the *Ryan* doctrine cannot be invoked unless the following elements are present:

> [A] shipowner, relying on the expertise of another party (the contractor), enters into a contract whereby the contractor agrees to perform services without supervision or control by the shipowner; the improper, unsafe or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a pre-existing unseaworthy condition; and the shipowner would thereby be exposed to liability regardless of fault. Where these elements are present, there will be implied in the contract an agreement by the contractor to indemnify the shipowner for any liability it might incur as a result of an unseaworthy condition caused or brought into play by the improper, unsafe or incompetent performance of the contractor.

*Fairmont Shipping Corp., supra* at 1258. (footnotes omitted)

Aside from whether the servicing party possessed expertise and controlled the bunkering, this case lacks the crucial ingredient of the *Ryan* cases, the shipowner's liability, regardless of fault, for the unworkmanlike performance of the contractor. Had a crewman of the Daring been injured by the overflow and resulting fire, and had the plaintiff been held liable under the unseaworthiness doctrine, then a case would exist appropriate for invoking the *Ryan* doctrine. But in the absence of plaintiff's exposure to liability regardless of fault, this is not a *Ryan* case and, consequently, while an implied warranty of workmanlike performance exists in the bunkering contract, *Fairmont Shipping Corp., supra* at 1259 & n.13, there is no basis

for an indemnity that disregards the plaintiff's contributory negligence.

*The Trade and Transport Indemnity*

The third-party action brought by Mobil Sales and Mobil Oil Corp. against Trade & Transport, Inc., was based on a provision contained in the marine fuel oil sales contract between Mobil Sales, which drew up the agreement, and Transport. Under this provision, Transport warranted

> that each vessel will be properly equipped, maintained, and operated so as to avoid leakage, spillage, overflow or water or land pollution and shall hold Seller [Mobil Sales] and its supplier [Mobil] harmless and indemnify Seller and its supplier against any claim, action, suit, assessment, fine, levy, penalty or exaction of a like nature instituted by any person (including public authorities) resulting from any such alleged leakage, spillage, overflow or water or land pollution asserted or assessed against Seller or its supplier on the ground of damages alleged to have resulted from any such alleged leakage, spillage, overflow, or water or land pollution, except insofar as it shall be established that such damage resulted exclusively from negligence of Seller or its supplier.

The district court concluded that this contract, which it viewed to be directed at environmental claims, "nowhere mentions damage to the vessel itself as a result of the events mentioned but appears rather to contemplate claims by those other than the ship to be supplied." 409 F.Supp. at 890.

■ The interpretation of an indemnity clause as part of a maritime contract is a matter governed by federal maritime law and not state law. *Capozziello v. Brasileiro*, 443 F.2d 1155, 1157 (2d Cir. 1971); *A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co.*, 256 F.2d 227, 229–30 (2d Cir.), *appeal dismissed*, 358 U.S. 801, 79 S.Ct. 9, 3 L.Ed.2d 49 (1958). The traditional rule of construction, applied in admiralty cases, is to construe

> contract language . . . most strongly against its drafter. That maxim

only applies, however, where the contract language is ambiguous—where it is susceptible of two reasonable and practical interpretations.

*American Export Isbrandtsen Lines, Inc. v. United States*, 390 F.Supp. 63, 66 (S.D.N.Y. 1975), *citing United States v. Seckinger*, 397 U.S. 203, 210–11, 90 S.Ct. 880, 884–85, 25 L.Ed.2d 224 (1970). *See Royal Indemnity Co. v. Kenny Const. Co.*, 528 F.2d 184, 190 n.7 (7th Cir. 1976); *Jones v. United States*, 304 F.Supp. 94, 103 (S.D.N.Y.1969), *aff'd*, 421 F.2d 835 (2d Cir. 1970). Among the factors that bear on the interpretation of an indemnity clause are the breadth of the language of the disputed provision; the existence of limiting definitions in the clause; whether a particular interpretation creates or avoids a redundancy; and the surrounding provisions of the entire agreement. *See Capozziello v. Brasileiro, supra*.

■ For the most part, the phraseology of the indemnity clause in the Mobil Sales contract is narrow and precise. The third-party defendant, Transport, for example, did not agree to indemnify for "all" losses on "any" claims "arising or resulting from the performance of this contract." *See Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817, 825 (5th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976); *Norddeutscher Lloyd v. Jones Stevedoring Co.*, 490 F.2d 648, 649 (9th Cir. 1973); *Moses-Ecco Co. v. Roscoe-Ajax Corp.*, 115 U.S.App.D.C. 366, 320 F.2d 685, 687 (1963). While the indemnity provision refers to "any claim," the claim must have resulted from specified occurrences: "leakage, spillage, overflow, or water or land pollution." In view of the obvious emphasis on discharges into the water, and the specific, parenthetical reference to "public authorities," the word "overflow" can reasonably be interpreted to contemplate only overflow of oil into a harbor in violation of public law or regulations, such as water purity standards, or the fouling of equipment on other vessels in the area of the bunkering operation. The phrase "leakage, spillage, overflow, or water or land pollution," is not rendered redundant by this

interpretation. The first three words appear to refer to inadvertent spillage, while the references to "pollution" connote intentional discharges.

 Moreover, the provision is ambiguous as to whether Mobil Sales is entitled to indemnity for claims brought by the owner of the other vessel, in this case the Daring. While the indemnity covers "any" claims by any "person," the parenthetical reference to "public authorities" is significant. In the one definition of who might bring a claim that would invoke the indemnity clause, Mobil Sales chose to refer to a third-party, "public authorities." It is reasonable to assume that, in the absence of a similar specific reference to claims by the owner of the "bunkeree" vessel, the parties contemplated only claims by third-parties.[3]

The district court reasonably interpreted the indemnity provision to concern itself with environmental claims brought by parties other than those engaged in the bunkering. While this may not be the only possible interpretation, Mobil Sales, the drafter of the contract, is not entitled to its construction of the indemnity clause. Having drawn an ambiguous agreement, one capable of two reasonable and practical interpretations, the defendants must be held to the interpretation least in their favor.

Affirmed.

MANSFIELD, Circuit Judge, concurring in part and dissenting in part:

I concur in Chief Judge Mishler's carefully considered opinion except insofar as it holds that the indemnity given by Trade & Transport, Inc. to Mobil Sales and Mobil Oil Corporation did not apply to plaintiff's claim.

The principle that ambiguous maritime indemnity provisions are to be strictly construed has no relevance here for the reason that there is nothing ambiguous about the indemnity clause forming the basis of the third-party claim, which is quoted *in toto* in the majority's opinion at page 47. In plain and unequivocal language the buyer's agent, Trade & Transport, Inc. ("Transport") warranted to the seller, Mobil Sales, that each vessel for which Transport purchased marine fuel oil (including plaintiff's Daring) would be "properly equipped, maintained and operated" so as to avoid "overflow" and agreed to hold Mobil Sales harmless against "any claims" for damages resulting from "any such . . . overflow" except to the extent that the damage "resulted exclusively from negligence of seller [Mobil Sales and Mobil Oil Corp.]."

In the present case it is undisputed that the damage to the Daring, which forms the basis of plaintiff's claim, was caused by an "overflow" and that the overflow did not result exclusively from negligence on the part of the seller but was 75% attributable to the negligence of the operator of the plaintiff's ship which was being bunkered. Thus the plain language of the indemnity clearly applies. Furthermore, it is rather obvious that the language was intended to cover this very type of risk. The parties recognized that the owner or buying agent for a ship being bunkered would be in a far better position to avert risks of damage due to overflow than would a servicing vessel

---

3. It is worth noting that Navieros Oceanikos was the disclosed principal of Transport for purposes of the contract, 409 F.Supp. at 887, and therefore obligated by elemental agency principles to provide indemnification. *See Lake City Stevedores, Inc. v. East West Shipping Agencies*, 474 F.2d 1060, 1063 (5th Cir. 1973); *Valkenburg, K.G. v. The S.S. Henry Denny*, 295 F.2d 330, 333 (7th Cir. 1961); *Newfield v. National Cash Register Co.*, 186 F.2d 883, 885 (2d Cir. 1951). Although paragraph 14 of the agreement states that "[i]f this contract is signed by Buyer [Transport] acting as agent on behalf of a disclosed or undisclosed principal, Buyer shall be liable for performance of all obligations of the principal, including payment," (Ex.Vol. 313) this clause appears only to have superadded the liability of the agent, not released the plaintiff. *See State Mut. Life Assurance Co. v. Peat, Marwick, Mitchell & Co.*, 49 F.R.D. 202, 211 (S.D.N.Y. 1969). We think it obvious that Transport would not have signed an agreement entitling the defendants to indemnification from the plaintiff on the plaintiff's own claims against the defendants. Certainly, before a court certifies the existence of what amounts to a license to breach the warranty of workmanlike performance, there must be clear and explicit language to that effect in the indemnity clause.

which merely pulls alongside the receiving ship and pumps oil into it. The supply ship could hardly be expected before each such operation to make a time-consuming inspection of the receiving vessel in order to determine whether it was adequately manned and equipped to avoid overflow or refuse delivery because of unsafe conditions wholly under the control of the buyer and/or the receiving vessel. Undoubtedly the parties further recognized that, even though the supplier might be partially to blame for an overflow, it would be difficult to fix or allocate the blame as between the parties, as turned out to be the case here.[1] Since the purchaser would usually be in a superior position to prevent or minimize such accidents, the parties agreed and intended that the seller would be entitled to indemnity from the buyer against such losses, except where the accident was caused "exclusively" by the seller's negligence.

Where the intent of the parties is so clear and the purpose of the indemnity is to avoid disputes over allocations of fault between the parties, enforcement of the indemnity clause does not offend any public policy principles. There is no suggestion, for instance, of overreaching on the part of Mobil Sales or Mobil Oil Corporation in the negotiation of the contract.

Thus the language of the agreement between Transport and Mobil Sales is crystal clear and, for the reasons stated above, the indemnity against "any claim" for damages caused by an overflow should be held to mean exactly what it says. Nevertheless the majority, in my view without rational basis, describes the indemnity as "ambiguous" and then proceeds to emasculate it by employment of methods of construction and interpretation which appear to me to be wholly unjustified and unsupportable. No evidence is offered and no principle of construction is cited to support the majority's view that the word "overflow" as used by the parties was intended to be limited to a discharge of oil into the harbor as distinguished from an overflow from the tanks of the receiving ship onto other parts of that ship where oil was not supposed to be found. Similarly there is no support for the conclusion that the reference to "public authorities" as an example of a possible claimant was intended to limit the meaning of the term "any" as used in the document or to preclude others, including the owner of the receiving vessel, from qualifying as a claimant.

The term "overflow" clearly means to flow or run over the brim of the tank into which the oil was to be pumped. "Public authorities" were referred to as an example in order to insure that third-party claims would not be excluded from the general term "any claim" and not to limit the latter term to third-party claims. The property most likely to be damaged by an overflow would be the ship being bunkered. Moreover, to suggest (as does the majority's note 3) that the plaintiff would not have signed an agreement entitling the servicing ship to indemnity, not only begs the question before us but ignores the sound practical reasons for requiring the "bunkeree" vessel to bear the risk. In effect the majority holds that the indemnity, despite its all-inclusive language, does not cover the accident which occurred in the present case because it fails to specify this particular kind of claim as against many others embraced by the agreement's broad language. Under such principles of construction Mobil Sales could only have protected itself by enumerating at length each and every specific type of claim that might be encountered rather than protecting itself against "any" claim. In my view, such particularization is not required to render the indemnity effective.

---

1. The present case is a good example of the difficulty confronted in attempting to apportion fault causing an overflow. Although the supplier here may have delayed in complying with the Daring's order to stop pumping, there were many steps which the Daring's crew, had it consisted of licensed engineers, could reasonably have been expected to take in order to avert an overflow, including closing the main intake valve, closing the save-oil valve, and paying closer attention to fuel levels. Under the circumstances the allocation of 25% of the blame to the supplier (Mobil Sales and Mobil Oil Corp.), while not clearly erroneous, is rather high.

For these reasons I would reverse the district court's decision holding that Mobil Sales and Mobil Oil Corporation were not entitled to indemnity from Transport.