QUINTEL CORPORATION, N.V., Plaintiff,

v.

CITIBANK, N.A., Defendant.

CITIBANK, N.A., Third-Party Plaintiff,

v.

H.R. GAJRIA, Arnold Alperstein, and Goldstick, Weinberger, Feldman, Alperstein & Taishoff, P.C., Third-Party Defendants.

QUINTEL CORPORATION, N.V., and H.R. Gajria, Plaintiff,

v.

Arnold S. ALPERSTEIN, et al., Defendants.

Nos. 80 Civ. 4936(RWS), 82 Civ. 4856(RWS).

United States District Court, S.D. New York.

Oct. 18, 1984.

Carro, Spanbock, Fass, Geller, Kaster & Cuiffo, New York City, for plaintiff and third-party defendant; Kenneth A. Lapatine, Charles D. Bock, Gilbert C. Ferrer, Vincent Lipari, Jeffrey K. Cymbler, New York City, of counsel.

Sherman & Sterling, New York City, for defendant and third-party plaintiff; Mark P. Zimmett, Jonathan L. Greenblatt, Catherine Gallo, Henry A. Udow, New York City, of counsel.

Wilson, Elser, Edelman & Dicker, New York City, for defendants and third-party defendants; Edward J. Boyle, Steven Kent, Thomas R. Manisero, Mary E. Reisert, New York City, of counsel.

SWEET, District Judge.

These consolidated actions are once again on the eve of trial. Quintel Corporation, N.V. ("Quintel"), a Netherlands Antilles corporation, commenced the action against Citibank, N.A. ("Citibank"), on August 27, 1980, in connection with Quintel's investment in Flag Associates, L.P. ("Flag"), a real estate limited partnership, alleging that Citibank violated section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, breached fiduciary duties owed to Quintel, committed fraud and acts of negligence, and converted monies and property belonging to Quintel. Citibank, in turn, filed a third-party complaint against H.R. Gajria ("Gajria"), the sole beneficial owner of Quintel, and against Robert Ginsburg, Nelson C. Rising and John M. Rudey, the general partners of Flag (collectively "general partners"). Quintel and the general partners entered into a settlement agreement in June 1983, pursuant to which Quintel received $6,100,-000.

Quintel and Gajria commenced an action against Arnold S. Alperstein, Gajria's attorney, and the law firm of Goldstick, Weinberger, Feldman, Alperstein & Taishoff, P.C. (collectively "Alperstein") on July 28, 1982, alleging negligence. The two actions were consolidated, 100 F.R.D. 695, and Citibank, in turn, asserted a claim against Alperstein [1] for contribution.

---

1. Alperstein sought leave to file a third party complaint against the general partners and the law firm that represented them. In an opinion and order dated December 23, 1983, the court permitted the assertion of a third party complaint against the law firm but not the general partners. The third party complaint was subse-

At the final pretrial conference on September 5, 1984, the parties raised certain substantive and evidentiary issues which were briefed and argued on September 21, 1984. These issues include: (i) whether an indemnity agreement precludes assertion of a claim of negligence against Citibank; (ii) whether evidence relating to Gajria's sophistication and financial resources is admissible; (iii) whether Quintel may recover damages in excess of fees paid to Citibank and Alperstein; (iv) and whether post-closing evidence of the actual performance of the investment property is admissible.

**Facts**

The underlying facts are fully described in the court's prior opinions and the parties' pretrial order filed on September 7, 1984. The actions arise from the parties' involvement in a real estate transaction that took place in 1979. On August 8, 1979, Gajria entered into an acquisition agreement ("Acquisition Agreement") with Citibank for the purpose of acquiring certain developed real property in Florida. The property was to be acquired by Flag, a limited partnership, of which Quintel was the limited partner. The acquisition was closed on August 14, 1979. Alperstein and his law firm performed legal services for Gajria and Quintel in connection with the acquisition.

The plaintiffs contend that, in advising Gajria to make the investment, Citibank, among other things:

(i) failed to disclose to Gajria that his capital contribution to Flag would be utilized not only to acquire the developed land but also for the acquisition by the Flag general partners of certain valuable undeveloped land of approximately 80 acres located adjacent to the developed land; and

(ii) presented to Gajria projections of income to be earned from the project which were derived without adequate due diligence and which omitted material facts and assumptions which would have been necessary to prevent Gajria from being misled.

In addition, they contend that Alperstein failed to inquire or learn of the undisclosed compensation the general partners would receive—*i.e.*, the undeveloped land.

**Citibank's Liability for Negligence**

Gajria and Citibank entered into the Acquisition Agreement on August 8, 1979. On the same date, Gajria assigned all of the rights and obligations contained in the Acquisition Agreement to Quintel which, in turn, accepted assignment of Gajria's rights and duties. In the absence of consent by Citibank to a delegation of Gajria's duties, Gajria remained liable for the obligations under the Acquisition Agreement. *See Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir.1977) (applying New York law); *Davidson v. Madison Corp.*, 257 N.Y. 120, 177 N.E. 393 (1931).

Clause 1(d) of the Acquisition Agreement provides that Citibank will coordinate the closing and will acquire property for the client, at the client's sole risk and expense. Clause 9 of the Acquisition Agreement provides:

**Indemnification**

Any actions or lack of action taken by Citibank, its affiliates, or subsidiaries in any capacity whatsoever with respect to real estate investments made pursuant hereto will be solely at the Client's risk and solely at the Client's expense and Citibank will be under no liability for any such action or failure to take any action except for its gross negligence or willful misconduct. The Client hereby agrees to indemnify and keep indemnified Citibank, its affiliates and subsidiaries against all actions, claims or demands, including attorneys fees, arising out of Citibank's exercise of any authority granted hereunder, except in cases of gross negligence and/or willful misconduct. Revocation by the Client of the powers granted to Citibank by this Agreement will not affect the Client's responsibility for indemnification with respect to acts and/or

quently dismissed by opinion and order dated June 4, 1984. 589 F.Supp. 1235.

failure to act occurring prior to receipt of such revocation.

According to Citibank, this Acquisition Agreement bars liability for negligence. Citibank also cites clause 15 of a Real Estate Investment Monitoring Agreement ("Monitoring Agreement") between Quintel and Citibank, which provides:

(15) **Indemnification**

Any actions or lack of action taken by Citibank, its affiliates, or subsidiaries in any capacity whatsoever with respect to any property in connection with this Agreement will be solely at the Owner's risk and expense and Citibank will be under no liability for any such action or failure to take any action except for its gross negligence or willful misconduct. The Owner hereby agrees to indemnify and keep indemnified Citibank, its affiliates and subsidiaries against all actions, claims or demands, including attorneys' fees, arising out of Citibank's exercise of any authority granted hereunder, except in cases of gross negligence and/or willful misconduct. Any such action, claim or demand may be settled at the discretion of Citibank, and its subsidiaries and affiliates after consultation with the Owner. The revocation of the powers granted to Citibank by this Agreement will not affect the Owner's responsibility for indemnification with respect to acts and/or failure to act occurring prior to receipt of such revocation.

Quintel seeks to limit these agreements to suits by third parties. While the Monitoring Agreement is susceptible to such an interpretation because of the settlement language, the Acquisition Agreement unambiguously states that "Citibank will be under no liability ... except for its gross negligence or willful misconduct." Gajria agreed, in addition, to indemnify Citibank "except in cases of gross negligence and willful misconduct."

█ Although contracts indemnifying a party against his own negligence are generally disfavored and strictly construed against the drafter, *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 409 F.Supp. 884, 890 (S.D.N.Y.1976), *aff'd*, 554 F.2d 43 (2d Cir.1978), "[c]ontractual provisions which express a clear and unmistakable intent to indemnify a party against his own negligence are enforceable under New York law." *Simon v. Corbetta Construction Co.*, 391 F.Supp. 708, 709 (S.D.N.Y.1975); *see, e.g., Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799 (1971); *Dillon v. Riverso Construction Co.*, 39 A.D.2d 744, 332 N.Y.S.2d 432 (2d Dep't 1972), *aff'd*, 33 N.Y.2d 530, 347 N.Y.S.2d 434, 301 N.E.2d 422 (1973). The Acquisition Agreement unambiguously absolves Citibank of liability for negligence, and therefore Gajria may not maintain a state cause of action charging Citibank with conduct less than gross negligence or willful misconduct.

█ Gajria is the sole beneficial shareholder of Quintel, a shell corporation that conducts no business. As a result, Gajria would be the direct beneficiary of any recovery obtained by Quintel in this action, and he is the real party in interest in this action. Since any recovery would devolve to Gajria, Quintel may not sue for less than gross negligence or willful misconduct. *See First National City Bank v. Banco para el Comercio Extersos de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). To rule otherwise "would permit the real beneficiary of such an action ... to obtain relief in our courts that it could not obtain in its own right ...." *Id.* at 2603.

### Evidence of Gajria's Sophistication as an Investor and Financial Resources

Citibank and Alperstein seek to admit evidence of Gajria's sophistication as an investor, his financial resources and his course of dealings with Citibank and Alperstein. Quintel and Gajria contend that evidence of Gajria's sophistication as an investor is irrelevant and inadmissible, arguing that the sophistication of the investor does not obviate the need for full disclosure.

█ Sophisticated investors are entitled to the protection of section 10(b) of the Securities Exchange Act of 1934 (the "1934

Act"), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. *See, e.g., Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Hanley v. SEC*, 415 F.2d 589, 596 (2d Cir.1969); *Stier v. Smith*, 473 F.2d 1205, 1207 (5th Cir. 1973); *Carroll v. First National Bank of Lincolnwood*, 413 F.2d 353, 357 (7th Cir.), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1969); *Lehigh Valley Trust Co. v. Central National Bank*, 409 F.2d 989, 992 (5th Cir.1969); *Miller v. Schweickart*, 405 F.Supp. 366, 369 (S.D.N.Y.1975); *Welch Foods Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1398 (S.D.N.Y.1974); *Barthe v. Rizzo*, 384 F.Supp. 1063, 1066–67 (S.D.N.Y.1974). However, the sophistication of Gajria is relevant to the adequacy of disclosure, *see Scarfarotti v. Bache & Co.*, 438 F.Supp. 199, 302–03 (S.D.N.Y.1977); *Berger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 505 F.Supp. 192, 194 (S.D.N.Y. 1981), and the extent of the reliance of Gajria on any alleged misrepresentation, *see Pittsburgh Coke & Chemical Co. v. Bollo*, 560 F.2d 1089, 1092 (2d Cir.1977). Therefore, such evidence is admissible.

**Quintel's Damages**

Section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a) limits recovery in a suit under the 1934 Act to "actual damages." The Court of Appeals has explained that the purpose of section 28(a) is "to compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the 1934 Act." *Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir.1981).

▇ Absent special circumstances, the actual damages of a defrauded purchaser are his out-of-pocket losses, defined as the excess of what he paid over the actual value of what he received. *See Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971); *Freschi v. Grand Coal Venture*, 588 F.Supp. 1257 at 1259 (S.D.N.Y.1984). Actual value is generally defined as the fair market value of a security on the date of purchase or at a subsequent date when the fraud was or should have been discov-

ered. *See Steinberg v. Carey*, 470 F.Supp. 471, 476 n. 19 (S.D.N.Y.1979).

The Court of Appeals has recently recognized that in some cases the appropriate measure of damages is the benefit of the bargain. *Osofsky v. Zipf, supra*, 645 F.2d at 109. This measure of damages gives the plaintiff the benefit of what was promised and permits recovery of the difference between the represented value and the actual value of what the plaintiff received. *Id.* In addition, the court has held that a plaintiff suing under Rule 10b–5 may recover consequential damages if he can "establish the causal nexus with a good deal of certainty." *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795, 803 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Freschi v. Grand Coal Venture, supra*, 588 F.Supp. at 1259–1260.

Quintel seeks $2,974,192 in damages under either measure. It claims that the benefit of the bargain is the appropriate measure of damages in this case, the benefit of the bargain being the total investment obtained by the general partners, 50% of the value of the undeveloped land, which was valued at $1,486,000, plus the $2,231,192.00 difference between the projected cash flow and the cash flow actually realized by Flag between August 14, 1979 and June 30, 1983. Alternatively, Quintel seeks its out-of-pocket loss, the difference between what it paid and the value of what it received, which it asserts is $2,974,192. Quintel maintains that the value of what it received in return for its investment was $4,100,000 less 50% of the value of the undeveloped land and the value by which its investment was diminished as a result of Citibank's false projections. Citibank and Alperstein, on the other hand, contend that Quintel is not entitled to recover more than $617,509, the amount of the fees Quintel paid to Citibank and Alperstein.

▇ A claim for the benefit of the bargain may be appropriate where damages "can be established with reasonable certainty." *Osofsky v. Zipf, supra*, 645 F.2d at 111; *see Barrows v. Forest Labor-*

*atories, Inc.,* 742 F.2d 54 (2d Cir.1984). Even if Quintel can establish its benefit of the bargain damages with sufficient certainty, however, the benefit of the bargain is not the appropriate measure of damages in the particular circumstance of this action. A defrauded plaintiff has the option of rescinding a transaction and being restored to his prior position, or of affirming the transaction and suing for damages suffered. *See Occidental Life Insurance Co. v. Pat Ryan & Assocs.,* 496 F.2d 1255, 1267 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974). Rescission and restitution are alternatives to money damages; a plaintiff cannot both rescind a transaction and ask for the benefit of the bargain rescinded. Instead, if a transaction is rescinded a plaintiff is only entitled to that which is necessary to restore him to his earlier position.

█ In this case, Quintel's settlement with Flag returned the amount of his investment, plus interest and operated to rescind the transaction. Once Quintel became aware of the fraud, it had the option of affirming its contract and demanding its fair share of the undeveloped land. Whether by characterizing the entire transaction as implicitly including the undeveloped property or by seeking reformation of the contract so that the undeveloped land would be included as part of the contract, Quintel would have been in a position to argue that it was entitled to benefit of the bargain damages that included the value of the undeveloped land. Quintel, however, chose not to affirm its contract, and instead by its June 1983 settlement agreement with the general partners liquidated its investment in Flag at its current value, $4,100,-000, plus interest of $2,100,000. Although the agreement stated that it shall not "be deemed to constitute a recission of the Partnership Agreement or of the investment made by the Limited Partner," ¶ 12, and that "nothing contained herein is intended or shall be deemed to affect, alter or interfere in any manner with claims now asserted in the action by the Limited Partner against Citibank, N.A.," ¶ 9, the settlement agreement operated as a recission.

The agreement was expressly intended "to effect a liquidation of the interest in the Partnership of [Quintel]." ¶ 1. Quintel elected to receive a return of all that it had paid, except for fees, and to return all that it had received.

Quintel disputes the characterization of the liquidation as a recission because the settlement did not take into account the undeveloped land and did not compensate Quintel for the amount by which its investment was diminished by the allegedly fraudulent projections. The projections were merely projections, however, not a guaranteed return, and Quintel bargained only to acquire the developed property, not the undeveloped land. Neither the general partners nor Citibank represented that the cash flow was guaranteed as projected or that the undeveloped land would be part of Quintel's investment. Paragraph 6.03 of the partnership agreement stated that the general partners would cause all of the assets "excluding, however, the property described on Exhibit A annexed hereto ... to be acquired by [Flag]." Exhibit A described the undeveloped land. Because the transaction as it was struck was rescinded, Quintel is entitled only to those out-of-pocket damages that will return it to the position it was in before the transaction.

Quintel's computation of out-of-pocket damages, although inventive, does not withstand scrutiny. The out-of-pocket measure of damages permits Quintel to recover the difference between what it paid and what it received. *Levine v. Seilon, Inc., supra,* 439 F.2d at 334. Quintel invested $4,100,000 and received back $4,100,000, plus $2,100,000 in interest when it settled with the general partners. The only expenses for which Quintel has not received reimbursement, and, therefore, its only out-of-pocket loss, are the fees it paid Citibank and Alperstein which total $617,-500.

Even if part of Quintel's investment was used to purchase something it did not receive, Quintel has been fully compensated by the return of what it paid plus interest.

There is no difference between the value of what it paid and what it received, regardless of the value of the Flag investment at the time of purchase. Therefore, Quintel has no out-of-pocket loss other than the unreimbursed fees.

■ Quintel argues that it is entitled to recover the profit obtained as a result of the fraudulent use of its money. In addition to the usual measure of damages, defrauders will be required to disgorge windfall profits. *See Zeller v. Bogue Electric Manufacturing Corporation, supra; Janigan v. Taylor,* 344 F.2d 781, 786–87 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); *cf. Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154–55, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In *Zeller,* the Court of Appeals held that the repudiation of the benefit of the bargain measure of damages for defrauded buyers in *Levine v. Seilon, Inc., supra,* did not bar a defrauded buyer from recovering windfall profits, stating:

> Such repudiation does not necessarily call for a rule that, if a fraudulent seller can be shown to have made a windfall profit, principles of the law of restitution do not require that he be made to disgorge it. *See* 6 Loss, Securities Regulation 3923. (Supp.1969). The reason why the remedy has been applied for the benefit of defrauded sellers but not of buyers is not any decisive legal difference by the difficulty generally confronting the defrauded buyer in showing that the fraudulent seller has in fact reaped such a profit.

*Zeller,* 476 F.2d at 802. In addition, the Court stated that "absent unusual circumstances, when a buyer has been induced to surrender consideration because of fraudulent conduct of a seller, it seems appropriate to require the seller to disgorge any profits he would otherwise have been in a position to realize if there can be traced with sufficient certainty." *Id.* at n. 10.

■ In this case, however, Quintel seeks to recover from Citibank windfall profits received by the general partners. Citibank received no benefit from or interest in the undeveloped land. Although joint tort feasors are jointly liable for actual damages, it is not appropriate to impose windfall damages, the purpose of which is to prevent unjust enrichment, on a defendant who did not receive the windfall profits. *See Nelson v. Serwold,* 687 F.2d 278, 281 (9th Cir.1982) ("[Serwold] should not be made to disgorge the profit from the sale of the stock owned by other members of the control group because [he] did not benefit from that profit ..."), *see also Norte & Co. v. Huffines,* 288 F.Supp. 855 (S.D.N.Y.1968), *aff'd in part, remanded in part,* 416 F.2d 1189 (2d Cir.1969), *cert. denied sub. nom. Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970); *Thomas v. Duralite Co.,* 386 F.Supp. 698, 726–27 (D.N.J.1974), *rev'd on other grounds,* 524 F.2d 577 (3d Cir.1975).

As a result, the appropriate measure of damages in the action against Citibank is Quintel's out-of-pocket loss which, after settling with the general partners and receiving a return of his investment plus interest, is limited to the fees paid by Quintel to Citibank and Alperstein, a total of $617,000.

## Post-Closing Evidence

■ Quintel and Gajria seek to admit evidence of Flag's post-closing actual performance. Insofar as such evidence relates to the determination of the value of the Flag investment at the time of closing, it is not material for the reasons just stated. Insofar as the post-closing evidence of Flag's performance relates to the discrepancies between Citibank's projections and Flag's actual result, however, it is relevant to the issue of Citibank's negligence in investigating those projections. While the mere fact that the projections were not realized is not in itself relevant evidence, *see, e.g., Marx v. Computer Science Corp.,* 507 F.2d 485, 490 n. 7 (9th Cir.1974), because only the circumstances and factors in existence at the time Citibank reviewed the projections must be considered, *see Chase Manhattan Bank, N.A. v. Perla,* 65 A.D.2d

207, 208, 411 N.Y.S.2d 66, 68 (4th Dept. 1978), the post-closing evidence as to the discrepancies between the projections and the result goes directly to the question of what factors were in existence at that time.

Citibank cites *Pipe Welding Supply Co. v. Haskell, Connor & Frost,* 61 N.Y.2d 884, 462 N.E.2d 1190, 474 N.Y.S.2d 472 (1984), in which the court held that evidence of an unexplained and substantial discrepancy between defendant-architect's projection of cost and the actual bids received was not sufficient proof of negligence, to support its proposition that the post-closing evidence is not probative of negligence. In *Pipe Welding,* however, the plaintiff relied solely on evidence of this discrepancy to prove negligence. In this case, Gajria seeks to introduce post-closing evidence to reveal the existence of specific factors that should have been considered in making the projections. Evidence as to the actual results of the Flag investment is relevant and probative of Citibank's negligence because it may serve to reveal circumstances and factors that Citibank should have taken into account at the time that it reviewed the projections. Furthermore, the probative value of the evidence is not outweighed by the danger of unfair prejudice to Citibank from admitting the evidence. The possibility that the jury will be misled by the post-closing evidence is considerably alleviated because the evidence will no longer be relevant to the issue of damages.

**Conclusion**

Therefore, neither Gajria nor Quintel may sue Citibank for less than gross negligence or willful misconduct; evidence relating to Gajria's sophistication and financial resources is admissible; the appropriate measure of damages is Quintel's out-of-pocket loss which is limited to the fees paid by Quintel to Citibank and Alperstein; and post-closing evidence of the actual performance of the Flag property is admissible as to the issue of Citibank's negligence.

**IT IS SO ORDERED.**