590 F.Supp. 816 (1984)
AMERICAN COMMERCIAL LINES, INC., Owner, and Inland Tugs Co., Owner, pro hac vice, of the Barge CHEM-104 in an Action for Exoneration From and/or Limitation of Liability, Petitioners,
American Commercial Lines, Inc., and Inland Tugs Co., Corporations, Plaintiffs,
v.
The UNITED STATES of America, Defendant.
Gerald FOX, Plaintiff,
v.
The UNITED STATES COAST GUARD and the United States of America, in personam, Defendants.
Gerald FOX, Plaintiff,
v.
AMERICAN COMMERCIAL BARGE LINE COMPANY, a corporation, and Monsanto Company, a corporation, Defendants.
Nos. 83-489C(1), 83-1364C(1) and 83-2242C(1).
United States District Court, E.D. Missouri, E.D.
July 9, 1984.
*817 *818 Michael D. O'Keefe, Thomas R. Jayne, Thompson & Mitchell, St. Louis, Mo., for American Commercial Barge Lines Co.
Kenneth R. Heineman, Louis F. Bonacorsi, St. Louis, Mo., for Monsanto Co.
Gary E. Peel, David Herndon, L. Thomas Lakin, Lakin, Herndon & Peel, P.C., Henry Sintzenich, East Alton, Ill., for Gerald Fox.
J. Paul McGrath, Debra J. Kossow, Asst. Atty. Gen., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., Joseph B. Moore, Asst. U.S. Atty., Dept. of Justice, William A. Cassels, Commander, Second Coast Guard District, St. Louis, Mo., for U.S.

MEMORANDUM
NANGLE, Chief Judge.
This admiralty action is a consolidation of three (3) separate actions which arose out of the alleged grounding of the barge CHEM-104 on or about March 4, 1981, while in the tow of the M/V R.W. NAYE. However, Cause Numbers 83-1364C(1) and 83-2242C(1) are no longer before this Court because plaintiff Gerald Fox has dismissed with prejudice his causes of action against the United States of America and Monsanto Company.
Cause Number 83-489A(1), the remaining action, consists of three (3) counts. In Count I, American Commercial Lines, Inc. (hereinafter "ACL") and Inland Tugs Co. (hereinafter "Inland Tugs") claim the benefit of the Limitation of Liability Act, 46 U.S.C. § 181 et seq., and seek exoneration from liability or limitation of their liability to the value of their interest in the CHEM-104 at the termination of her voyage following the alleged grounding. In Counts II and III, respectively, ACL and Inland Tugs sought the recovery of damages to barge CHEM-104 proximately caused by the alleged negligence of the United States in maintaining the navigable channel and a declaratory judgment against the United States for indemnity for all liability and expenses incurred in defending the claims of third persons. During the trial of this action this Court directed a verdict in favor of the United States with respect to Counts II and III. Therefore, Count I is the only remaining original claim by ACL and Inland Tugs.
Three (3) claimants responded to the limitation action in Count I of No. 83-489A(1) and asserted claims: 1) Gerald Fox (hereinafter "Fox"); 2) the United States; and 3) Monsanto Company (hereinafter "Monsanto"). The United States dismissed its claims and is no longer before this Court.
Fox seeks recovery of $1,000,000.00 from ACL and Inland Tugs in the limitation proceeding *819 for damages he allegedly suffered as a result of his exposure to styrene fumes following the alleged grounding of barge CHEM-104.
Monsanto filed a two (2) count first amended counterclaim. Count II is no longer before this Court as a result of Fox's dismissal with prejudice of his claim against Monsanto. Monsanto's only claim before this Court is Count I of its first amended counterclaim, wherein it seeks a declaratory judgment in its favor that would require ACL and American Commercial Barge Line Company (hereinafter "ACBL") to indemnify it for any liability and expenses incurred by Monsanto in defending claims of third parties as a result of the alleged grounding of barge CHEM-104.
Monsanto also brought a cross-claim against the United States for indemnification and/or contribution, but said cross-claim was dismissed by this Court. ACL and Inland Tugs also brought a third-party complaint against Monsanto for contribution with respect to Gerald Fox's claim, but said third-party complaint was dismissed by this Court.
In sum, there are three (3) claims pending before this Court: 1) ACL's and Inland Tugs' claim for exoneration from or limitation of liability; 2) Fox's claim against ACL and Inland Tugs; and 3) Monsanto's claim against ACL and ACBL for indemnity.
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. ACL, Inland Tugs and ACBL are Delaware corporations with their principal places of business in Jeffersonville, Indiana. ACBL and Inland Tugs are separate and distinct corporations and wholly-owned subsidiaries of ACL.
2. Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.
3. Fox is a Missouri resident and a corporal in the Missouri State Water Patrol (hereinafter "Water Patrol").
4. ACL is the owner of the M/V R.W. NAYE (hereinafter "NAYE"), a river towboat, and barge CHEM-104, an unmanned, unpowered, steel hulled chemical barge.
5. Inland Tugs operated the NAYE and barge CHEM-104. On March 4, 1981, the value of the barge CHEM-104, including its cargo, was $315,000.00.
6. On March 4, 1981, the barge CHEM-104 was in the tow of the NAYE at or near Mile 253 on the Upper Mississippi River while said towboat was in the process of navigating its tow northbound. The tow of the NAYE consisted of fifteen (15) barges, three (3) wide by five (5) long, with barge CHEM-104 as the port stern barge in the tow. Of the fifteen (15) barges, thirteen (13) were empty and two (2) were loaded. Barge CHEM-104 and another barge were the two (2) loaded barges. Barge CHEM-104 was laden with a cargo of liquid styrene, owned by Monsanto, and carried by Inland Tugs under a contract of carriage between ACBL and Monsanto. The barge CHEM-104 was loaded to a draft of nine (9) feet and two (2) inches. The other loaded barge was loaded with salt and located on the stern of the center string. The NAYE was faced up entirely to the salt barge and partially to the barge CHEM-104.
7. Liquid styrene is a toxic and flammable liquid.
8. The placement of the barge CHEM-104 in the port stern string was not unsafe. Captain Nochta, the captain of the NAYE on March 4, 1981, and a duly licensed river pilot and tankerman, had complete discretion to place the barges into any configuration that he determined safe for navigation and this Court credits his testimony that it was safe to place the barge CHEM-104 in *820 the port stern string. It is speculation to assume that the barge CHEM-104 would not have grounded if it had been placed in the center string of the tow. It was neither unreasonable nor negligent for ACL and Inland Tugs to vest sole discretion with respect to tow configuration in their captains.
9. During the late afternoon of March 4, 1981, at approximately 5:40 p.m., the NAYE was proceeding northbound on the Upper Mississippi River under the helm of Pilot Michael Chism, a duly licensed river towboat pilot, when the barge CHEM-104 grounded on an unknown and unmarked sandbar or other object ten (10) to fifteen (15) feet outside of the navigable channel while making the crossing between Ellswood light, below the crossing, and Burr Oak light, above the crossing, at approximately Mile 253.5.
10. Prior to committing himself to making the crossing, Pilot Chism stopped the NAYE and its tow at the beginning of the crossing and made a visual observation of the existing conditions in the river channel. Both Pilot Chism and Captain Nochta were aware that the U.S. Coast Guard had not made its first buoy run[1] of the year because many buoys were missing or dragged off position. Three (3) of the five (5) black buoys that mark the channel on the right descending bank (Missouri side of the river) were missing and only one black buoy, located approximately one (1) mile up river near Red's Landing, was visible.
11. Pilot Chism was familiar with this stretch of the river and had successfully navigated this crossing on numerous prior occasions.
12. This was the first run by either Pilot Chism or Captain Nochta on the Upper Mississippi following the winter of 1980-81. It is common practice for towboats to begin their navigation season on the Upper Mississippi River before the Coast Guard makes its first buoy run. On March 4, 1981, several towboats, other than the NAYE, had already successfully been up the river past Mile 253.5. At least twelve (12) vessels had "made lock" at Lock and Dam No. 25, which is above Mile 253.5, prior to March 4, 1981. Two (2) other vessels owned and operated by ACL and Inland Tugs had, prior to March 4, 1981, navigated this portion of the river without encountering or reporting any difficulty in traversing the crossing at Mile 253. In addition, prior to March 4, 1981, the River Industry Advisory Committee had lifted all draft and two size limits and deemed the river safe for operations. Therefore, neither Pilot Chism nor Captain Nochta was negligent by navigating this portion of the river prior to the Coast Guard's first buoy run of the season. It also was not negligent for ACL and Inland Tugs to send the NAYE on the Upper Mississippi prior to the Coast Guard's first buoy run of the season.
13. Pilot Chism knew that the imaginary line between Ellswood light and Burr Oak light did not delineate the navigable portion of the channel. To successfully navigate the crossing between Ellswood light and Burr Oak light, without grounding, it was necessary for Pilot Chism to navigate south of the imaginary line between those lights, which is what he did. In addition to the lights, however, Pilot Chism also relied on the established landmarks, his knowledge of the channel at Mile 253, and the single, visible black buoy to chart his course along the crossing. It was unreasonable and negligent for Pilot Chism to rely, even in part, on the black buoy because he knew or should have known that said buoy was not reliable in early March prior to the U.S. Coast Guard's first buoy run up the river. In fact, the *821 visible black buoy was 100 feet north of its intended station.
14. The barge CHEM-104 grounded on the black buoy or Missouri side of the river. As the grounding occurred, the barge CHEM-104 listed to starboard and the NAYE rode up on top of said barge, puncturing a hole in the cargo tank. Liquid styrene spilled into the river. Captain Nochta came up to the pilot house immediately after the grounding and radioed the Coast Guard Marine Safety Office (hereinafter "CGMSO") in St. Louis, Missouri. He gave the CGMSO the location of the grounding, the type of cargo leaking into the river, the name of the vessel, and the name of the company involved. The CGMSO advised Captain Nochta that they would contact other proper authorities and alert them as to the location of the grounding and the spill.
15. While the barge CHEM-104 was aground, Captain Nochta secured the other fourteen (14) barges which had broken loose subsequent to the grounding. He tied the other fourteen (14) barges to the Missouri bank/black buoy side of the river, approximately one (1) mile downstream of the grounding. The NAYE then returned to the barge CHEM-104 and pulled it off ground. Upon being pulled off ground, the leakage of liquid styrene ceased but fumes were still escaping. During the period of time it was grounded, approximately one (1) hour and twenty (20) minutes, over 26,000 gallons of liquid styrene spilled into the river. Representatives of ACL boarded the NAYE and the CHEM-104 approximately four (4) hours after the barge was pulled off ground. ACL representatives temporarily repaired the barge and the styrene fumes were completely contained. Captain Nochta acted reasonably and prudently subsequent to the grounding.
16. The crew of the NAYE was neither trained to make repairs to the holes in barge CHEM-104 nor had the materials aboard to make such repairs. It was neither unreasonable nor negligent for ACL and Inland Tugs to refrain from so training or so equipping the personnel aboard their vessels.
17. There were two (2) depth sounders, also known as transducers, aboard the NAYE on March 4, 1981. A depth sounder can be used to determine the distance between the river bottom and the hulls of the barges to which they are attached. Given the drafts of each barge and the length of the pole extending down from the barge to which the depth sounder is attached, the pilot can determine how much water is beneath the tow.
18. On March 4, 1981, Pilot Chism and Captain Nochta were using only one (1) of the two (2) depth sounders on the NAYE's tow. It was attached to a pole one (1) foot below the lead (empty) barge in the center string, which barge had a draft of one (1) and one-half (½) feet. However, on March 4, 1981, Pilot Chism was unaware of the depth that the sounder was set, to indicate an area not navigable by the NAYE and its tow. There was no evidence that the sounder alarm went off prior to the grounding of the barge CHEM-104.
19. Pilot Chism was negligent in two (2) ways with respect to the depth sounders. First, he was negligent in not being aware of the depth to which the attached sounder was set. Second, both he and Captain Nochta were negligent in not attaching the second depth sounder to the lead barge of the stern string or to the barge CHEM-104 itself, where the barge CHEM-104 was in the stern string rather than the center string. The depth sounder attached to the lead barge in the center string was not in a position to record or register the depth over which the port string barges were going, including the barge CHEM-104 which contained a toxic chemical.
20. It was neither unreasonable nor negligent for ACL and Inland Tugs to vest their captains and pilots with discretion as to the use of depth sounders.
21. A rebuttable presumption of negligence on the part of Pilot Chism arises from the fact that the barge CHEM-104 grounded outside of the navigable channel. Said presumption was not rebutted by ACL *822 and Inland Tugs. The strength of said presumption is bolstered by the fact that other vessels had made this crossing prior to March 4, 1981, without incident.
22. The grounding of the barge CHEM-104, and the subsequent escape of styrene, was proximately caused by: a) the negligence of Pilot Chism in relying on the black buoy to make the crossing; b) the negligence of Pilot Chism in navigating the NAYE and its tow; and c) the negligence of Pilot Chism and Captain Nochta in not attaching a depth sounder to one of the port string barges.
23. ACL and Inland Tugs lacked both knowledge and privity of the negligent acts of Pilot Chism and Captain Nochta. ACL and Inland Tugs were not primarily negligent in any manner. ACL and Inland Tugs did not breach their duty to provide a competent master and crew on the NAYE or to provide a seaworthy vessel.
24. After Captain Nochta contacted the CGMSO, the CGMSO contacted the Lincoln County Sheriff's Office who in turn contacted Corporal Fox of the Water Patrol at approximately 6:25 p.m. Fox was aware of the toxic nature of styrene but did not have available to him any breathing apparatus or special clothing to protect himself against exposure while he was in the vicinity of the spill.
25. The liquid styrene which leaked into the river was carried downstream by the current and eventually dissipated. However, around 7:30 p.m., Corporal Fox determined that, due to the flammable nature of styrene, persons living in the area west and south of Mile 254 to Mile 241.4 should be evacuated. From 7:30 p.m. to 9:00 p.m., Fox drove his personal automobile around the evacuation area notifying residents of possible fire hazards and suggesting that they leave the area. At approximately 9:30 p.m., Fox determined that the threat of fire had subsided and that the residents could safely return to their homes. Fox remained at the nearby Lock and Dam 25 until 11:00 p.m. talking with the lock master before returning to his home. Fox was not negligent in any respect and did not assume the risk of styrene exposure.
26. Fox's exposure to the styrene fumes was short in duration and mild in concentration. Fox was never closer than one (1) mile from the site of the spill.
27. On March 5, 1981, Fox admitted himself to the Lincoln County Memorial Hospital complaining of a sore throat and eye irritation. He was treated and released. These symptoms disappeared in a matter of days. Fox's sore throat and eye irritation were proximately caused by his exposure to styrene fumes.
28. Fox does have a symptomatic mitral valve prolapse (hereinafter "MVP"), which is a congenital disorder that causes chest pains. Fox's MVP condition preexisted his brief exposure to styrene and was neither caused nor aggravated by said exposure. Fox had symptoms of MVP, such as chest pains and anxiety, prior to March 4, 1981. Subsequent to March 4, 1981, Fox became aware that he had an MVP after a series of medical exams. These medical exams were prompted, in part, by Fox's superior who witnessed Fox have an attach of chest pains. The limitations on Fox's ability to perform the duties of his job with the Water Patrol are a direct result, not of his exposure to styrene, but this pre-existing MVP condition and his emotional reaction to knowledge that he has an MVP condition.
29. Fox was damaged in the amount of his medical bills during the month of March, 1981, for treatment of his throat and eye inflammation caused by styrene exposure. These bills total $551.30. In addition, Fox is entitled to compensation in the amount of $1,500.00 for his pain and suffering, in the form of throat and eye inflammation, caused by styrene exposure. Fox is not entitled to damages for his MVP condition and its consequences which were not caused or aggravated by styrene exposure.
30. On December 12, 1979, ACBL and Monsanto entered into a Line Haul Barge Contract Agreement for the transportation of chemicals owned by Monsanto. In Article *823 XII of said agreement, Monsanto agreed to pay "any damages, expenses, costs, liability or other expenses of ACBL [or its affiliates] to any third party, arising from any discharge of its cargo into navigable waters."
31. Subsequent to the December 12, 1979, contract, ACBL and Monsanto entered into negotiations to modify their contract. On April 24, 1981, Thomas Frazier, III, acting within the scope of his agency or employment with ACBL, wrote in a letter to Monsanto that "if new agreements are signed, ACBL will as an accommodation to Monsanto, accept legal liability for the consequences of the accident that occurred March 4, 1981, involving the CHEM-104 in the tow of the M/V R.W. NAYE notwithstanding the terms and conditions of our existing contract."
32. On June 3, 1981, a Monsanto official sent a telex to ACBL stating that "[i]n regard to your letter of April 24 it is our understanding that ACBL accepts legal liability for the CHEM-104 incident on March 4, 1981."
33. In response, Thomas Frazier, III, sent a telex to Monsanto on June 4, 1981, stating:
For the period from the inception of our contract, until a temporary agreement is worked out with Alliance, ACBL will assume liability, for discharge of cargos other than acrylonitrile, for damages to third parties, including those arising from the CHEM-104 incident (the only known incident) contingent upon satisfactory new agreements being worked out between ACBL/Monsanto/Alliance. The foregoing conforms to my letter of April 24, which is substantially different than as stated in your Telex of 6/3.
34. On June 8, 1981, Monsanto sent the following telex to ACBL:
Effective this date, Monsanto and AMS have reached agreement on an interim ninety-day unit tow contract. As per the second paragraph of ACBL's June 4 Telex to Monsanto, ACBL assumes third-party liability under Monsanto/ACBL line haul agreement dated 12/12/79.
ACBL did not object to anything in the June 8, 1981, telex. On August 13, 1981, W.V. Green, acting within the scope of his agency or employment with ACBL, acknowledged the replacement of the December 12, 1979, agreement between ACBL and Monsanto with new agreements among ACBL, Monsanto, and Alliance Marine. The new contract omitted the previous Article XII, except with reference to one particular kind of cargo, and left each party to assume its own liability, if any.
35. The language used by the parties in their correspondence is ambiguous and capable of more than one reasonable interpretation. However, based on the language used, the prior agreement in Article XII, and the surrounding circumstances, the intent of the parties was for ACBL to assume all liability, both its own and Monsanto's, for damages to third parties arising out of the grounding of the barge CHEM-104 on March 4, 1981. In this regard the testimony of Thomas Frazier, III, was not credible. Monsanto performed all conditions precedent to enforcement of said agreement.

B. CONCLUSIONS OF LAW
This Court has subject matter jurisdiction over this action pursuant to general admiralty and maritime law and 28 U.S.C. § 1333.

1. Fox's Claim of Negligence

This Court finds that the sole proximate cause of the grounding and resulting damages in this case was the negligent acts of the NAYE by Pilot Chism and Captain Nochta. See Findings of Fact Nos. 13, 19, 21, 22. Although a tug is not an insurer or bailer of its tow, it has a duty to exercise reasonable care and that degree of maritime skill that prudent navigators employ in similar circumstances. AgriTrans Corporation v. M/V Clarence G. Frame, No. 81-1562A(D), slip op. at 12 (E.D.MO. December 30, 1983). See also Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 349, 76 L.Ed. 699 (1931); MidAmerican Transportation Company, Inc. *824 v. National Marine Service, Inc., 497 F.2d 776, 779 (8th Cir.1974), cert. denied 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976). Here, Pilot Chism was negligent in relying on the black buoy, in not being aware of the depth to which the attached sounder was set, and in not attaching the second depth sounder to the lead barge of the stern string or to the barge CHEM-104 itself. See Findings of Fact Nos. 13, 19, 22. Captain Nochta was also negligent in not attaching the second depth sounder.
In addition, because the barge CHEM-104 grounded outside of the navigable channel, see Finding of Fact No. 9, a presumption arises that the NAYE was negligently navigated by Pilot Chism. See Finding of Fact No. 21. Mid-America Transportation Company, Inc., 497 F.2d at 779. ACL and Inland Tugs did not show a reasonable explanation for the accident and, thus, did not rebut this presumption. Id. See also Steamer Webb, 81 U.S. (H. Wall.) 406, 414, 20 L.Ed. 774 (1871); Bisso v. Waterways Transportation Co., 235 F.2d 741, 744 (5th Cir.1956). The evidence did not support the position that the grounding was an unavoidable accident.
Fox's other theories of negligence, such as the placement of the barge CHEM-104 and navigating prior to the first buoy run, are without merit. See Findings of Fact Nos. 8, 12. In addition, ACL and Inland Tugs were not primarily negligent in several of the respects claimed by Fox. These include, the failure of ACL and Inland Tugs to restrict the discretion of its captains and pilots with respect to tow configuration, the use of depth sounders, or navigating on the Upper Mississippi prior to the Coast Guard's first buoy run. See Findings of Fact Nos. 8, 12, 20. It also was not negligent for ACL and Inland Tugs to refrain from training or equipping its crews to personally handle ruptures in chemical barges. See Finding of Fact No. 16. See generally, Signal Oil and Gas Co. v. Barge W-701, 654 F.2d 1164, 1170 (5th Cir.1981).[2]

2. ACL And Inland Tugs' Claim For Exoneration or Limitation

Because, as discussed supra, Pilot Chism and Captain Nochta negligently caused the grounding of the barge CHEM-104, ACL and Inland Tugs are not entitled to exoneration from liability. With respect to limitation of liability, the pertinent provision of the Limitation of Liability Act provides, as follows:
The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
46 U.S.C. § 183(a) (emphasis added). The significance of § 183(a) is that the "errors in navigation or other negligence by [the] master or crew are not attributable to [the owner] on respondeat superior for limitation purposes." Tittle v. Aldacosta, 544 F.2d 752, 756 (5th Cir.1977). To establish the "privity or knowledge" exception with respect to a corporate defendant, and thus defeat a claim for limitation, it must be shown that the negligence in question was that "of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." Coryell v. Phipps, 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943).
In the case at bar, the only negligence proven by Fox was that of Pilot *825 Chism and Captain Nochta. Fox did not prove that one of the classes of persons enumerated in Coryell, and acting on behalf of ACL or Inland Tugs, had privity or knowledge of the negligent acts of Chism and Nochta which proximately caused the accident in question. See Findings of Fact No. 23. Accordingly, ACL and Inland Tugs are entitled to the benefit of the Limitation of Liability Act. However, there remains the question of the amount of the limitation fund.
The value of the limitation fund is the value of the interest of the owner in the offending vessel and her pending freight at the end of her voyage following the incident. 46 U.S.C. § 183(a). A barge is a separate and independent vessel. It is not part of the motor vessel for purposes of determining the limitation fund. In re Cook Transportation System, Inc., 431 F.Supp. 437, 441 (W.D.Tenn.1976). The fact that another vessel is connected to the barge causing the harm does not convert both vessels into a single unit for determining liability. The owner's liability is limited to the vessel actually responsible for the harm. In re American Commercial Lines, Inc., 353 F.Supp. 872, 874 (E.D.Ky. 1973). Here, the offending vessel was the barge CHEM-104. The NAYE was not the offending vessel for the purpose of limitation. The value of the CHEM-104, and thus the limitation fund, was $315,000.00 on March 4, 1981. See Finding of Fact No. 5.

3. Fox's Damages

Fox's damages, for which ACL and Inland Tugs are liable, total Two Thousand Fifty-One and 30/100 Dollars ($2,051.30). See Finding of Fact No. 29. This amount compensates Fox for his medical bills and his pain and suffering in connection with the irritation of his eyes and throat, which irritation was caused by his exposure to styrene. See Finding of Fact No. 27. Fox's MVP condition and its consequences were not caused by his exposure to styrene. See Finding of Fact No. 28.

4. Monsanto's Cross-Claim

Monsanto claims that the correspondence between Monsanto and ACBL in the spring of 1981, see Findings of Fact Nos. 30-35, created a contract whereby ACBL agreed to indemnify Monsanto for all liability to third parties for damages arising out of the grounding of the barge CHEM-104. ACBL admits that said correspondence modified the prior arrangement, whereby Monsanto assumed third party liability for damages resulting from accidents involving its chemicals. See Finding of Fact No. 30. However, ACBL contends that under the modified arrangements ACBL agreed to accept only ACBL's third party liability with respect to the barge CHEM-104. ACBL argues that it did not also agree to accept Monsanto's liability arising out of the incident.
The construction of a maritime contract is a matter governed by federal maritime law. Navieros Oceanikos, S.A. v. S.T. Mobil Trader, 554 F.2d 43, 47 (2d Cir.1977); Capozziello v. Brasilerio, 443 F.2d 1155, 1157 (2d Cir.1971). The guiding principle for a court construing a maritime contract is to give effect to the parties' intentions. Treasurer Salvors v. Unidentified Wrecked and Abandoned Sailing Vessels, 556 F.Supp. 1319, 1335 (S.D.Fla. 1983) (citations omitted). A court may not look to extrinsic evidence to determine the intent of the parties, unless the written language is ambiguous. Corbitt v. Diamond M Drilling Co., 654 F.2d 329, 332-33 (5th Cir.1981); American Export Isbrandtsen Lines, Inc. v. United States, 390 F.Supp. 63, 66 (S.D.N.Y.1975). Moreover, where the written language is ambiguous it must be construed against its drafter. Navieros Oceanikos, S.A., 554 F.2d at 47.
In the case at bar, the written language of the parties is ambiguous with respect to the extent that ACBL agreed to assume liability for the barge CHEM-104 accident. See Finding of Fact No. 35. It matters not which item of correspondence this Court focuses on, because they all are *826 ambiguous on this crucial issue. The April 24, 1981, letter from ACBL uses the language, "accept legal liability for the consequences...." See Finding of Fact No. 31. The June 4, 1981, and June 8, 1981, telexes refer to "damages to third parties" and "ACBL assumes third-party liability," respectively. Each of these is not clear as to whether ACBL agreed to assume, contrary to the prior arrangement, only its own liability or whether ACBL agreed to assume all liability with respect to the incident in question.
Although the question is a close one, it is the opinion of this Court that the latter interpretation effectuates the true intent of the parties. Several factors support this result. First, ACBL was offering to modify the liability aspect of the original contract "as an accommodation," see Finding of Fact No. 31, or inducement to Monsanto to modify other aspects of the original contract. Assumption by ACBL of the liability of both ACBL and Monsanto with respect to the barge CHEM-104 accident, is more consistent with the accommodation purpose. Second, the parties knew how to be specific with respect to the extent of agreements to transfer liability. The original agreement provided that Monsanto assumed the third party liability "of ACBL." See Finding of Fact No. 30. The absence of such limiting or specific language in the modifying agreements strongly suggest that a limited transfer of liability was not intended. ACBL, if it intended as it argues, could easily have included "of ACBL" after "legal liability." Finally, the lack of clarity in these agreements must be construed against ACBL because it authored the offers to modify the original agreement. Accordingly, this Court concludes that ACBL is obligated to assume all liability, both its own and that of Monsanto, for damages to third parties arising out of the grounding of the barge CHEM-104.
Furthermore, because the agreement between Monsanto and ACBL is a personal contract, it is not subject to limitation under the 46 U.S.C. § 181 et seq. S & E Shipping Corporation v. Chesapeake & Ohio Railway Company, 678 F.2d 636, 644 n. 14 (6th Cir.1982).

5. Conclusions

In sum, ACL and Inland Tugs are entitled to limitation of liability and are liable to Fox for damages in the amount of $2,051.30. ACBL is obligated to Monsanto to assume all third party liability for damages with respect to the grounding of the barge CHEM-104. Said obligation is not subject to limitation.
NOTES
[1] The U.S. Coast Guard maintains navigational buoys on the Mississippi River. They mark the outer limits of the navigational channel. Red buoys mark the left limit of the navigational channel and black buoys mark the right limit of the navigational channel. The buoys require regular maintenance to prevent them from becoming mispositioned by river currents and other forces. The navigational season on the Upper Mississippi ends in November or December and the Coast Guard usually does not make channel patrols until early spring due to ice conditions.
[2] Fox's additional claim that ACL and Inland Tugs are liable for violating 33 U.S.C. § 351 is frivolous and without merit.